(Slip Opinion) OCTOBER TERM, 2013 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## McCUTCHEON ET AL. *v*. FEDERAL ELECTION COMMISSION

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

No. 12–536.   Argued October 8, 2013—Decided April 2, 2014

The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Congress may regulate campaign contributions to protect against corruption or the appearance of corruption.  See, *e.g., Buckley* v. *Valeo*, 424 U. S. 1, 26–27.  It may not, however, regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others.  See, *e.g., Arizona Free Enterprise Club's Freedom Club PAC* v. *Bennett*, 564 U. S. ___, ___.

 The Federal Election Campaign Act of 1971 (FECA), as amended by the Bipartisan Campaign Reform Act of 2002 (BCRA), imposes two types of limits on campaign contributions.  Base limits restrict how much money a donor may contribute to a particular candidate or committee while aggregate limits restrict how much money a donor may contribute in total to all candidates or committees.  2 U. S. C. §441a.

 In the 2011–2012 election cycle, appellant McCutcheon contributed to 16 different federal candidates, complying with the base limits applicable to each.  He alleges that the aggregate limits prevented him from contributing to 12 additional candidates and to a number of noncandidate political committees.  He also alleges that he wishes to make similar contributions in the future, all within the base limits. McCutcheon and appellant Republican National Committee filed a complaint before a three-judge District Court, asserting that the aggregate limits were unconstitutional under the First Amendment. The District Court denied their motion for a preliminary injunction and granted the Government's motion to dismiss.  Assuming that the

base limits appropriately served the Government's anticorruption interest, the District Court concluded that the aggregate limits survived First Amendment scrutiny because they prevented evasion of the base limits.

*Held*: The judgment is reversed, and the case is remanded.

893 F. Supp. 2d 133, reversed and remanded.

   CHIEF JUSTICE ROBERTS, joined by JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE ALITO, concluded that the aggregate limits are invalid under the First Amendment.  Pp. 7–40.

   (a) Appellants' substantial First Amendment challenge to the current system of aggregate limits merits plenary consideration.  Pp. 7–14.

      (1) In *Buckley*, this Court evaluated the constitutionality of the original contribution and expenditure limits in FECA.  *Buckley* distinguished the two types of limits based on the degree to which each encroaches upon protected First Amendment interests.  It subjected expenditure limits to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression."  424 U. S., at 44–45.  But it concluded that contribution limits impose a lesser restraint on political speech and thus applied a lesser but still "rigorous standard of review," *id.,* at 29, under which such limits "may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms," *id.,* at 25.  Because the Court found that the primary purpose of FECA—preventing *quid pro quo* corruption and its appearance—was a "sufficiently important" governmental interest, *id.,* at 26–27, it upheld the base limit under the "closely drawn" test, *id.,* at 29.  After doing so, the Court devoted only one paragraph of its 139-page opinion to the aggregate limit then in place under FECA, noting that the provision "ha[d] not been separately addressed at length by the parties."  *Id.,* at 38.  It concluded that the aggregate limit served to prevent circumvention of the base limit and was "no more than a corollary" of that limit.  *Id.,* at 38.  Pp. 7–9.

      (2) There is no need in this case to revisit *Buckley*'s distinction between contributions and expenditures and the corresponding distinction in standards of review.  Regardless whether strict scrutiny or the "closely drawn" test applies, the analysis turns on the fit between the stated governmental objective and the means selected to achieve that objective.  Here, given the substantial mismatch between the Government's stated objective and the means selected to achieve it, the aggregate limits fail even under the "closely drawn" test.

   *Buckley*'s ultimate conclusion about the constitutionality of the aggregate limit in place under FECA does not control here.  *Buckley* spent just three sentences analyzing that limit, which had not been

separately addressed by the parties. Appellants here, by contrast, have directly challenged the aggregate limits in place under BCRA, a different statutory regime whose limits operate against a distinct legal backdrop. Most notably, statutory safeguards against circumvention have been considerably strengthened since *Buckley*. The 1976 FECA Amendments added another layer of base limits—capping contributions from individuals to political committees—and an antiproliferation rule prohibiting donors from creating or controlling multiple affiliated political committees. Since *Buckley*, the Federal Election Commission has also enacted an intricate regulatory scheme that further limits the opportunities for circumvention of the base limits through "unearmarked contributions to political committees likely to contribute" to a particular candidate. 424 U. S., at 38. In addition to accounting for such statutory and regulatory changes, appellants raise distinct legal arguments not considered in *Buckley,* including an overbreadth challenge to the aggregate limit. Pp. 10–14.

(b) Significant First Amendment interests are implicated here. Contributing money to a candidate is an exercise of an individual's right to participate in the electoral process through both political expression and political association. A restriction on how many candidates and committees an individual may support is hardly a "modest restraint" on those rights. The Government may no more restrict how many candidates or causes a donor may support than it may tell a newspaper how many candidates it may endorse. In its simplest terms, the aggregate limits prohibit an individual from fully contributing to the primary and general election campaigns of ten or more candidates, even if all contributions fall within the base limits. And it is no response to say that the individual can simply contribute less than the base limits permit: To require one person to contribute at lower levels because he wants to support more candidates or causes is to penalize that individual for "robustly exercis[ing]" his First Amendment rights. *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 739.

In assessing the First Amendment interests at stake, the proper focus is on an individual's right to engage in political speech, not a collective conception of the public good. The whole point of the First Amendment is to protect individual speech that the majority might prefer to restrict, or that legislators or judges might not view as useful to the democratic process. Pp. 14–18.

(c) The aggregate limits do not further the permissible governmental interest in preventing *quid pro quo* corruption or its appearance. Pp. 18–36.

    (1) This Court has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or

the appearance of corruption. See *Davis*, *supra*, at 741. Moreover, the only type of corruption that Congress may target is *quid pro quo* corruption. Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to *quid pro quo* corruption. Nor does the possibility that an individual who spends large sums may garner "influence over or access to" elected officials or political parties. *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 359. The line between *quid pro quo* corruption and general influence must be respected in order to safeguard basic First Amendment rights, and the Court must "err on the side of protecting political speech rather than suppressing it." *Federal Election Comm'n* v. *Wisconsin Right to Life*, 551 U. S. 449, 457 (opinion of ROBERTS, C. J.). Pp. 18–21.

(2) The Government argues that the aggregate limits further the permissible objective of preventing *quid pro quo* corruption. The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount, even though Congress's selection of a base limit indicates its belief that contributions beneath that amount do not create a cognizable risk of corruption. The Government must thus defend the aggregate limits by demonstrating that they prevent circumvention of the base limits, a function they do not serve in any meaningful way. Given the statutes and regulations currently in effect, *Buckley*'s fear that an individual might "contribute massive amounts of money to a particular candidate through . . . unearmarked contributions" to entities likely to support the candidate, 424 U. S., at 38, is far too speculative. Even accepting *Buckley*'s circumvention theory, it is hard to see how a candidate today could receive "massive amounts of money" that could be traced back to a particular donor uninhibited by the aggregate limits. The Government's scenarios offered in support of that possibility are either illegal under current campaign finance laws or implausible. Pp. 21–30.

(3) The aggregate limits also violate the First Amendment because they are not "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, *supra*, at 25. The Government argues that the aggregate limits prevent an individual from giving to too many initial recipients who might then recontribute a donation, but experience suggests that the vast majority of contributions are retained and spent by their recipients. And the Government has provided no reason to believe that candidates or party committees would dramatically shift their priorities if the aggregate limits were lifted. The indiscriminate ban on all contributions above the aggregate limits is thus disproportionate to the Government's interest in preventing circumvention.

Importantly, there are multiple alternatives available to Congress that would serve the Government's interest in preventing circumvention while avoiding "unnecessary abridgment" of First Amendment rights. *Buckley*, *supra*, at 25. Such alternatives might include targeted restrictions on transfers among candidates and political committees, or tighter earmarking rules. Transfers, after all, are the key to the Government's concern about circumvention, but they can be addressed without such a direct and broad interference with First Amendment rights. Pp. 30–35.

  (4) Disclosure of contributions also reduces the potential for abuse of the campaign finance system. Disclosure requirements, which are justified by "a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending," *Citizens United*, *supra*, at 367, may deter corruption "by exposing large contributions and expenditures to the light of publicity," *Buckley*, *supra* at 67. Disclosure requirements may burden speech, but they often represent a less restrictive alternative to flat bans on certain types or quantities of speech. Particularly with modern technology, disclosure now offers more robust protections against corruption than it did when *Buckley* was decided. Pp. 35–36.

  (d) The Government offers an additional rationale for the aggregate limits, arguing that the opportunity for corruption exists whenever a legislator is given a large check, even if the check consists of contributions within the base limits to be divided among numerous candidates or committees. That rationale dangerously broadens the circumscribed definition of *quid pro quo* corruption articulated in prior cases. *Buckley* confined its analysis to the possibility that "massive amounts of money" could be funneled to a particular candidate in excess of the base limits. 424 U. S., at 38. Recasting as corruption a donor's widely distributed support for a political party would dramatically expand government regulation of the political process. And though the Government suggests that *solicitation* of large contributions poses the corruption danger, the aggregate limits are not limited to any direct solicitation by an officeholder or candidate. Pp. 36–39.

  JUSTICE THOMAS agreed that the aggregate limits are invalid under the First Amendment, but would overrule *Buckley* v. *Valeo*, 424 U. S. 1, and subject BCRA's aggregate limits to strict scrutiny, which they would surely fail. *Buckley*'s "analytic foundation . . . was tenuous from the very beginning and has only continued to erode in the intervening years." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 412 (THOMAS, J., dissenting). Contributions and expenditures are simply "two sides of the same First Amendment coin," and this Court's efforts to distinguish the two have produced mere "word

Syllabus

games" rather than any cognizable constitutional law principle. *Buckley*, *supra,* at 241, 244 (Burger, C. J., concurring in part and dissenting in part).  Pp. 1–5.

ROBERTS, C. J., announced the judgment of the Court and delivered an opinion, in which SCALIA, KENNEDY, and ALITO, JJ., joined.  THOMAS, J., filed an opinion concurring in the judgment.  BREYER, J., filed a dissenting opinion, in which GINSBURG, SOTOMAYOR, and KAGAN, JJ., joined.

Opinion of ROBERTS, C. J.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 12–536

SHAUN McCUTCHEON, ET AL., APPELLANTS *v.*
FEDERAL ELECTION COMMISSION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[April 2, 2014]

CHIEF JUSTICE ROBERTS announced the judgment of the Court and delivered an opinion, in which JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE ALITO join.

There is no right more basic in our democracy than the right to participate in electing our political leaders. Citizens can exercise that right in a variety of ways: They can run for office themselves, vote, urge others to vote for a particular candidate, volunteer to work on a campaign, and contribute to a candidate's campaign. This case is about the last of those options.

The right to participate in democracy through political contributions is protected by the First Amendment, but that right is not absolute. Our cases have held that Congress may regulate campaign contributions to protect against corruption or the appearance of corruption. See, *e.g., Buckley* v. *Valeo*, 424 U. S. 1, 26–27 (1976) (*per curiam*). At the same time, we have made clear that Congress may not regulate contributions simply to reduce the amount of money in politics, or to restrict the political participation of some in order to enhance the relative influence of others. See, *e.g., Arizona Free Enterprise*

*Club's Freedom Club PAC* v. *Bennett*, 564 U. S. ___, ___ (2011) (slip op., at 24–25).

Many people might find those latter objectives attractive: They would be delighted to see fewer television commercials touting a candidate's accomplishments or disparaging an opponent's character. Money in politics may at times seem repugnant to some, but so too does much of what the First Amendment vigorously protects. If the First Amendment protects flag burning, funeral protests, and Nazi parades—despite the profound offense such spectacles cause—it surely protects political campaign speech despite popular opposition. See *Texas* v. *Johnson*, 491 U. S. 397 (1989); *Snyder* v. *Phelps*, 562 U. S. ___ (2011); *National Socialist Party of America* v. *Skokie*, 432 U. S. 43 (1977) (*per curiam*). Indeed, as we have emphasized, the First Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co.* v. *Roy*, 401 U. S. 265, 272 (1971).

In a series of cases over the past 40 years, we have spelled out how to draw the constitutional line between the permissible goal of avoiding corruption in the political process and the impermissible desire simply to limit political speech. We have said that government regulation may not target the general gratitude a candidate may feel toward those who support him or his allies, or the political access such support may afford. "Ingratiation and access . . . are not corruption." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 360 (2010). They embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns.

Any regulation must instead target what we have called "*quid pro quo*" corruption or its appearance. See *id.,* at 359. That Latin phrase captures the notion of a direct

exchange of an official act for money. See *McCormick* v.
*United States*, 500 U. S. 257, 266 (1991). "The hallmark of
corruption is the financial *quid pro quo*: dollars for po-
litical favors." *Federal Election Comm'n* v. *National Con-
servative Political Action Comm.*, 470 U. S. 480, 497
(1985). Campaign finance restrictions that pursue other
objectives, we have explained, impermissibly inject the
Government "into the debate over who should govern."
*Bennett*, *supra*, at \_\_\_ (slip op., at 25). And those who
govern should be the *last* people to help decide who *should*
govern.

The statute at issue in this case imposes two types of
limits on campaign contributions. The first, called base
limits, restricts how much money a donor may contribute
to a particular candidate or committee. 2 U. S. C.
§441a(a)(1). The second, called aggregate limits, restricts
how much money a donor may contribute in total to all
candidates or committees. §441a(a)(3).

This case does not involve any challenge to the base
limits, which we have previously upheld as serving the
permissible objective of combatting corruption. The Gov-
ernment contends that the aggregate limits also serve that
objective, by preventing circumvention of the base limits.
We conclude, however, that the aggregate limits do little,
if anything, to address that concern, while seriously re-
stricting participation in the democratic process. The
aggregate limits are therefore invalid under the First
Amendment.

I

A

For the 2013–2014 election cycle, the base limits in the
Federal Election Campaign Act of 1971 (FECA), as
amended by the Bipartisan Campaign Reform Act of 2002
(BCRA), permit an individual to contribute up to $2,600
per election to a candidate ($5,200 total for the primary

and general elections); $32,400 per year to a national party committee;[1] $10,000 per year to a state or local party committee; and $5,000 per year to a political action committee, or "PAC." 2 U. S. C. §441a(a)(1); 78 Fed. Reg. 8532 (2013).[2] A national committee, state or local party committee, or multicandidate PAC may in turn contribute up to $5,000 per election to a candidate. §441a(a)(2).[3]

The base limits apply with equal force to contributions that are "in any way earmarked or otherwise directed through an intermediary or conduit" to a candidate. §441a(a)(8). If, for example, a donor gives money to a party committee but directs the party committee to pass the contribution along to a particular candidate, then the transaction is treated as a contribution from the original donor to the specified candidate.

For the 2013–2014 election cycle, the aggregate limits in BCRA permit an individual to contribute a total of $48,600 to federal candidates and a total of $74,600 to other political committees. Of that $74,600, only $48,600 may be contributed to state or local party committees and PACs,

---

[1] There are six authorized national party committees: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. See 2 U. S. C. §431(14).

[2] A PAC is a business, labor, or interest group that raises or spends money in connection with a federal election, in some cases by contributing to candidates. A so-called "Super PAC" is a PAC that makes only independent expenditures and cannot contribute to candidates. The base and aggregate limits govern contributions to traditional PACs, but not to independent expenditure PACs. See *SpeechNow.org* v. *Federal Election Comm'n*, 599 F. 3d 686, 695–696 (CADC 2010) (en banc).

[3] A multicandidate PAC is a PAC with more than 50 contributors that has been registered for at least six months and has made contributions to five or more candidates for federal office. 11 CFR §100.5(e)(3) (2012). PACs that do not qualify as multicandidate PACs must abide by the base limit applicable to individual contributions.

as opposed to national party committees. §441a(a)(3); 78 Fed. Reg. 8532. All told, an individual may contribute up to $123,200 to candidate and noncandidate committees during each two-year election cycle.

The base limits thus restrict how much money a donor may contribute to any particular candidate or committee; the aggregate limits have the effect of restricting how many candidates or committees the donor may support, to the extent permitted by the base limits.

B

In the 2011–2012 election cycle, appellant Shaun McCutcheon contributed a total of $33,088 to 16 different federal candidates, in compliance with the base limits applicable to each. He alleges that he wished to contribute $1,776 to each of 12 additional candidates but was prevented from doing so by the aggregate limit on contributions to candidates. McCutcheon also contributed a total of $27,328 to several noncandidate political committees, in compliance with the base limits applicable to each. He alleges that he wished to contribute to various other political committees, including $25,000 to each of the three Republican national party committees, but was prevented from doing so by the aggregate limit on contributions to political committees. McCutcheon further alleges that he plans to make similar contributions in the future. In the 2013–2014 election cycle, he again wishes to contribute at least $60,000 to various candidates and $75,000 to non-candidate political committees. Brief for Appellant McCutcheon 11–12.

Appellant Republican National Committee is a national political party committee charged with the general management of the Republican Party. The RNC wishes to receive the contributions that McCutcheon and similarly situated individuals would like to make—contributions otherwise permissible under the base limits for national

party committees but foreclosed by the aggregate limit on contributions to political committees.

In June 2012, McCutcheon and the RNC filed a complaint before a three-judge panel of the U. S. District Court for the District of Columbia. See BCRA §403(a), 116 Stat. 113–114. McCutcheon and the RNC asserted that the aggregate limits on contributions to candidates and to noncandidate political committees were unconstitutional under the First Amendment. They moved for a preliminary injunction against enforcement of the challenged provisions, and the Government moved to dismiss the case.

The three-judge District Court denied appellants' motion for a preliminary injunction and granted the Government's motion to dismiss. Assuming that the base limits appropriately served the Government's anticorruption interest, the District Court concluded that the aggregate limits survived First Amendment scrutiny because they prevented evasion of the base limits. 893 F. Supp. 2d 133, 140 (2012).

In particular, the District Court imagined a hypothetical scenario that might occur in a world without aggregate limits. A single donor might contribute the maximum amount under the base limits to nearly 50 separate committees, each of which might then transfer the money to the same single committee. *Ibid.* That committee, in turn, might use all the transferred money for coordinated expenditures on behalf of a particular candidate, allowing the single donor to circumvent the base limit on the amount he may contribute to that candidate. *Ibid.* The District Court acknowledged that "it may seem unlikely that so many separate entities would willingly serve as conduits" for the single donor's interests, but it concluded that such a scenario "is not hard to imagine." *Ibid.* It thus rejected a constitutional challenge to the aggregate limits, characterizing the base limits and the aggregate

limits "as a coherent system rather than merely a collection of individual limits stacking prophylaxis upon prophylaxis." *Ibid.*

McCutcheon and the RNC appealed directly to this Court, as authorized by law. 28 U. S. C. §1253. In such a case, "we ha[ve] no discretion to refuse adjudication of the case on its merits," *Hicks* v. *Miranda*, 422 U. S. 332, 344 (1975), and accordingly we noted probable jurisdiction. 568 U. S. \_\_\_ (2013).

## II

### A

*Buckley* v. *Valeo*, 424 U. S. 1, presented this Court with its first opportunity to evaluate the constitutionality of the original contribution and expenditure limits set forth in FECA. FECA imposed a $1,000 per election base limit on contributions from an individual to a federal candidate. It also imposed a $25,000 per year aggregate limit on all contributions from an individual to candidates or political committees. 18 U. S. C. §§608(b)(1), 608(b)(3) (1970 ed., Supp. IV). On the expenditures side, FECA imposed limits on both independent expenditures and candidates' overall campaign expenditures. §§608(e)(1), 608(c).

*Buckley* recognized that "contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities." 424 U. S., at 14. But it distinguished expenditure limits from contribution limits based on the degree to which each encroaches upon protected First Amendment interests. Expenditure limits, the Court explained, "necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Id.,* at 19. The Court thus subjected expenditure limits to "the exacting scrutiny applicable to limitations on core First Amendment rights of political expression." *Id.,* at 44–45. Under exacting scrutiny, the

Government may regulate protected speech only if such regulation promotes a compelling interest and is the least restrictive means to further the articulated interest. See *Sable Communications of Cal., Inc.* v. *FCC*, 492 U. S. 115, 126 (1989).

By contrast, the Court concluded that contribution limits impose a lesser restraint on political speech because they "permit[ ] the symbolic expression of support evidenced by a contribution but do[ ] not in any way infringe the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U. S., at 21. As a result, the Court focused on the effect of the contribution limits on the freedom of political association and applied a lesser but still "rigorous standard of review." *Id.,* at 29. Under that standard, "[e]ven a '"significant interference" with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of associational freedoms." *Id.,* at 25 (quoting *Cousins* v. *Wigoda*, 419 U. S. 477, 488 (1975)).

The primary purpose of FECA was to limit *quid pro quo* corruption and its appearance; that purpose satisfied the requirement of a "sufficiently important" governmental interest. 424 U. S., at 26–27. As for the "closely drawn" component, *Buckley* concluded that the $1,000 base limit "focuses precisely on the problem of large campaign contributions . . . while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." *Id.,* at 28. The Court therefore upheld the $1,000 base limit under the "closely drawn" test. *Id.,* at 29.

The Court next separately considered an overbreadth challenge to the base limit. See *id.,* at 29–30. The challengers argued that the base limit was fatally overbroad

because most large donors do not seek improper influence over legislators' actions. Although the Court accepted that premise, it nevertheless rejected the overbreadth challenge for two reasons: First, it was too "difficult to isolate suspect contributions" based on a contributor's subjective intent. *Id.,* at 30. Second, "Congress was justified in concluding that the interest in safeguarding against the appearance of impropriety requires that the opportunity for abuse inherent in the process of raising large monetary contributions be eliminated." *Ibid.*

Finally, in one paragraph of its 139-page opinion, the Court turned to the $25,000 aggregate limit under FECA. As a preliminary matter, it noted that the constitutionality of the aggregate limit "ha[d] not been separately addressed at length by the parties." *Id.,* at 38. Then, in three sentences, the Court disposed of any constitutional objections to the aggregate limit that the challengers might have had:

> "The overall $25,000 ceiling does impose an ultimate restriction upon the number of candidates and committees with which an individual may associate himself by means of financial support. But this quite modest restraint upon protected political activity serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party. The limited, additional restriction on associational freedom imposed by the overall ceiling is thus no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid." *Ibid.*

## B

### 1

The parties and *amici curiae* spend significant energy debating whether the line that *Buckley* drew between contributions and expenditures should remain the law. Notwithstanding the robust debate, we see no need in this case to revisit *Buckley*'s distinction between contributions and expenditures and the corollary distinction in the applicable standards of review. *Buckley* held that the Government's interest in preventing *quid pro quo* corruption or its appearance was "sufficiently important," *id.*, at 26–27; we have elsewhere stated that the same interest may properly be labeled "compelling," see *National Conservative Political Action Comm.*, 470 U. S., at 496–497, so that the interest would satisfy even strict scrutiny. Moreover, regardless whether we apply strict scrutiny or *Buckley*'s "closely drawn" test, we must assess the fit between the stated governmental objective and the means selected to achieve that objective. See, *e.g., National Conservative Political Action Comm.*, *supra,* at 496–501; *Randall* v. *Sorrell*, 548 U. S. 230, 253–262 (2006) (opinion of BREYER, J.). Or to put it another way, if a law that restricts political speech does not "avoid unnecessary abridgement" of First Amendment rights, *Buckley*, 424 U. S., at 25, it cannot survive "rigorous" review.

Because we find a substantial mismatch between the Government's stated objective and the means selected to achieve it, the aggregate limits fail even under the "closely drawn" test. We therefore need not parse the differences between the two standards in this case.

### 2

*Buckley* treated the constitutionality of the $25,000 aggregate limit as contingent upon that limit's ability to prevent circumvention of the $1,000 base limit, describing the aggregate limit as "no more than a corollary" of the

base limit. *Id.,* at 38. The Court determined that circumvention could occur when an individual legally contributes "massive amounts of money to a particular candidate through the use of unearmarked contributions" to entities that are themselves likely to contribute to the candidate. *Ibid.* For that reason, the Court upheld the $25,000 aggregate limit.

Although *Buckley* provides some guidance, we think that its ultimate conclusion about the constitutionality of the aggregate limit in place under FECA does not control here. *Buckley* spent a total of three sentences analyzing that limit; in fact, the opinion pointed out that the constitutionality of the aggregate limit "ha[d] not been separately addressed at length by the parties." *Ibid.* We are now asked to address appellants' direct challenge to the aggregate limits in place under BCRA. BCRA is a different statutory regime, and the aggregate limits it imposes operate against a distinct legal backdrop.

Most notably, statutory safeguards against circumvention have been considerably strengthened since *Buckley* was decided, through both statutory additions and the introduction of a comprehensive regulatory scheme. With more targeted anticircumvention measures in place today, the indiscriminate aggregate limits under BCRA appear particularly heavy-handed.

The 1976 FECA Amendments, for example, added another layer of base contribution limits. The 1974 version of FECA had already capped contributions *from* political committees to candidates, but the 1976 version added limits on contributions *to* political committees. This change was enacted at least "in part to prevent circumvention of the very limitations on contributions that this Court upheld in *Buckley*." *California Medical Assn.* v. *Federal Election Comm'n*, 453 U. S. 182, 197–198 (1981) (plurality opinion); see also *id.,* at 203 (Blackmun, J., concurring in part and concurring in judgment). Because

a donor's contributions to a political committee are now limited, a donor cannot flood the committee with "huge" amounts of money so that each contribution the committee makes is perceived as a contribution from him. *Buckley*, *supra*, at 38. Rather, the donor may contribute only $5,000 to the committee, which hardly raises the specter of abuse that concerned the Court in *Buckley*. Limits on contributions to political committees consequently create an additional hurdle for a donor who seeks both to channel a large amount of money to a particular candidate and to ensure that he gets the credit for doing so.

The 1976 Amendments also added an antiproliferation rule prohibiting donors from creating or controlling multiple affiliated political committees. See 2 U. S. C. §441a(a)(5); 11 CFR §100.5(g)(4). The Government acknowledges that this antiproliferation rule "forecloses what would otherwise be a particularly easy and effective means of circumventing the limits on contributions to any particular political committee." Brief for Appellee 46. In effect, the rule eliminates a donor's ability to create and use his own political committees to direct funds in excess of the individual base limits. It thus blocks a straightforward method of achieving the circumvention that was the underlying concern in *Buckley*.

The intricate regulatory scheme that the Federal Election Commission has enacted since *Buckley* further limits the opportunities for circumvention of the base limits via "unearmarked contributions to political committees likely to contribute" to a particular candidate. 424 U. S., at 38. Although the earmarking provision, 2 U. S. C. §441a(a)(8), was in place when *Buckley* was decided, the FEC has since added regulations that define earmarking broadly. For example, the regulations construe earmarking to include any designation, "whether direct or indirect, express or implied, oral or written." 11 CFR §110.6(b)(1). The regulations specify that an individual who has contributed to a

particular candidate may not also contribute to a single-candidate committee for that candidate. §110.1(h)(1). Nor may an individual who has contributed to a candidate also contribute to a political committee that has supported or anticipates supporting the same candidate, if the individual knows that "a substantial portion [of his contribution] will be contributed to, or expended on behalf of," that candidate. §110.1(h)(2).

In addition to accounting for statutory and regulatory changes in the campaign finance arena, appellants' challenge raises distinct legal arguments that *Buckley* did not consider. For example, presumably because of its cursory treatment of the $25,000 aggregate limit, *Buckley* did not separately address an overbreadth challenge with respect to that provision. The Court rejected such a challenge to the *base* limits because of the difficulty of isolating suspect contributions. The propriety of large contributions to individual candidates turned on the subjective intent of donors, and the Court concluded that there was no way to tell which donors sought improper influence over legislators' actions. See 424 U. S., at 30. The aggregate limit, on the other hand, was upheld as an anticircumvention measure, without considering whether it was possible to discern which donations might be used to circumvent the base limits. See *id.,* at 38. The Court never addressed overbreadth in the specific context of aggregate limits, where such an argument has far more force.

Given the foregoing, this case cannot be resolved merely by pointing to three sentences in *Buckley* that were written without the benefit of full briefing or argument on the issue. See *Toucey* v. *New York Life Ins. Co.*, 314 U. S. 118, 139–140 (1941) (departing from "[l]oose language and a sporadic, ill-considered decision" when asked to resolve a question "with our eyes wide open and in the light of full consideration"); *Hohn* v. *United States*, 524 U. S. 236, 251 (1998) (departing from a prior decision where it

"was rendered without full briefing or argument"). We are confronted with a different statute and different legal arguments, at a different point in the development of campaign finance regulation. Appellants' substantial First Amendment challenge to the system of aggregate limits currently in place thus merits our plenary consideration.[4]

### III

The First Amendment "is designed and intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests." *Cohen* v. *California*, 403 U. S. 15, 24 (1971). As relevant here, the First Amendment safeguards an individual's right to participate in the public debate through political expression and political association. See *Buckley*, 424 U. S., at 15. When an individual contributes money to a candidate, he exercises both of those rights: The contribution "serves as a general expression of support for the candidate and his views" and "serves to affiliate a person with a candidate." *Id.,* at 21–22.

Those First Amendment rights are important regardless whether the individual is, on the one hand, a "lone pamphleteer[ ] or street corner orator[ ] in the Tom Paine mold," or is, on the other, someone who spends "substan-

_____

[4] The dissent contends that we should remand for development of an evidentiary record before answering the question with which we were presented. See *post,* at 28–30 (opinion of BREYER, J). But the parties have treated the question as a purely legal one, and the Government has insisted that the aggregate limits can be upheld under the existing record alone. See Tr. of Oral Arg. 43, 55–56. We take the case as it comes to us.

tial amounts of money in order to communicate [his] political ideas through sophisticated" means. *National Conservative Political Action Comm.*, 470 U. S., at 493. Either way, he is participating in an electoral debate that we have recognized is "integral to the operation of the system of government established by our Constitution." *Buckley*, *supra,* at 14.

*Buckley* acknowledged that aggregate limits at least diminish an individual's right of political association. As the Court explained, the "overall $25,000 ceiling does impose an ultimate restriction upon the number of candidates and committees with which an individual may associate himself by means of financial support." 424 U. S., at 38. But the Court characterized that restriction as a "quite modest restraint upon protected political activity." *Ibid.* We cannot agree with that characterization. An aggregate limit on *how many* candidates and committees an individual may support through contributions is not a "modest restraint" at all. The Government may no more restrict how many candidates or causes a donor may support than it may tell a newspaper how many candidates it may endorse.

To put it in the simplest terms, the aggregate limits prohibit an individual from fully contributing to the primary and general election campaigns of ten or more candidates, even if all contributions fall within the base limits Congress views as adequate to protect against corruption. The individual may give up to $5,200 each to nine candidates, but the aggregate limits constitute an outright ban on further contributions to any other candidate (beyond the additional $1,800 that may be spent before reaching the $48,600 aggregate limit). At that point, the limits deny the individual all ability to exercise his expressive and associational rights by contributing to someone who will advocate for his policy preferences. A donor must limit the number of candidates he supports, and may have

to choose which of several policy concerns he will advance—clear First Amendment harms that the dissent never acknowledges.

It is no answer to say that the individual can simply contribute less money to more people. To require one person to contribute at lower levels than others because he wants to support more candidates or causes is to impose a special burden on broader participation in the democratic process. And as we have recently admonished, the Government may not penalize an individual for "robustly exercis[ing]" his First Amendment rights. *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 739 (2008).

The First Amendment burden is especially great for individuals who do not have ready access to alternative avenues for supporting their preferred politicians and policies. In the context of base contribution limits, *Buckley* observed that a supporter could vindicate his associational interests by personally volunteering his time and energy on behalf of a candidate. See 424 U. S., at 22, 28. Such personal volunteering is not a realistic alternative for those who wish to support a wide variety of candidates or causes. Other effective methods of supporting preferred candidates or causes without contributing money are reserved for a select few, such as entertainers capable of raising hundreds of thousands of dollars in a single evening. Cf. *Davis*, *supra*, at 742.[5]

The dissent faults this focus on "the individual's right to engage in political speech," saying that it fails to take into account "the public's interest" in "collective speech." *Post,* at 6 (opinion of BREYER, J). This "collective" interest is

_____

[5] See, *e.g.,* Felsenthal, Obama Attends Fundraiser Hosted by Jay-Z, Beyonce, Reuters, Sept. 18, 2012; Coleman, Kid Rock Supports Paul Ryan at Campaign Fundraiser, Rolling Stone, Aug. 25, 2012; Mason, Robert Duvall to Host Romney Fundraiser, L. A. Times, July 25, 2012; Piazza, Hillary Lands 2.5M with Rocket Man, N. Y. Daily News, Apr. 10, 2008, p. 2.

said to promote "a government where laws reflect the very thoughts, views, ideas, and sentiments, the expression of which the First Amendment protects." *Post,* at 7.

But there are compelling reasons not to define the boundaries of the First Amendment by reference to such a generalized conception of the public good. First, the dissent's "collective speech" reflected in laws is of course the will of the majority, and plainly can include laws that restrict free speech. The whole point of the First Amendment is to afford individuals protection against such infringements. The First Amendment does not protect the government, even when the government purports to act through legislation reflecting "collective speech." Cf. *United States* v. *Alvarez*, 567 U. S. ___ (2012); *Wooley* v. *Maynard*, 430 U. S. 705 (1977); *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624 (1943).

Second, the degree to which speech is protected cannot turn on a legislative or judicial determination that particular speech is useful to the democratic process. The First Amendment does not contemplate such "ad hoc balancing of relative social costs and benefits." *United States* v. *Stevens*, 559 U. S. 460, 470 (2010); see also *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S. 803, 818 (2000) ("What the Constitution says is that" value judgments "are for the individual to make, not for the Government to decree, even with the mandate or approval of a majority").

Third, our established First Amendment analysis already takes account of any "collective" interest that may justify restrictions on individual speech. Under that accepted analysis, such restrictions are measured against the asserted public interest (usually framed as an important or compelling governmental interest). As explained below, we do not doubt the compelling nature of the "collective" interest in preventing corruption in the electoral process. But we permit Congress to pursue that

interest only so long as it does not unnecessarily infringe an individual's right to freedom of speech; we do not truncate this tailoring test at the outset.

## IV
### A

With the significant First Amendment costs for individual citizens in mind, we turn to the governmental interests asserted in this case. This Court has identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption. See *Davis, supra*, at 741; *National Conservative Political Action Comm.*, 470 U. S., at 496–497. We have consistently rejected attempts to suppress campaign speech based on other legislative objectives. No matter how desirable it may seem, it is not an acceptable governmental objective to "level the playing field," or to "level electoral opportunities," or to "equaliz[e] the financial resources of candidates." *Bennett*, 564 U. S., at ___ (slip op., at 22–23); *Davis, supra*, at 741–742; *Buckley, supra*, at 56. The First Amendment prohibits such legislative attempts to "fine-tun[e]" the electoral process, no matter how well intentioned. *Bennett, supra,* at ___ (slip op., at 21).

As we framed the relevant principle in *Buckley*, "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." 424 U. S., at 48–49. The dissent's suggestion that *Buckley* supports the opposite proposition, see *post,* at 6, simply ignores what *Buckley* actually said on the matter. See also *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 295 (1981) ("*Buckley* . . . made clear that contributors cannot be protected from the possibility that others will make larger contributions").

Moreover, while preventing corruption or its appearance is a legitimate objective, Congress may target only a specific type of corruption—"*quid pro quo*" corruption. As *Buckley* explained, Congress may permissibly seek to rein in "large contributions [that] are given to secure a political *quid pro quo* from current and potential office holders." 424 U. S., at 26. In addition to "actual *quid pro quo* arrangements," Congress may permissibly limit "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions" to particular candidates. *Id.,* at 27; see also *Citizens United*, 558 U. S., at 359 ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption").

Spending large sums of money in connection with elections, but not in connection with an effort to control the exercise of an officeholder's official duties, does not give rise to such *quid pro quo* corruption. Nor does the possibility that an individual who spends large sums may garner "influence over or access to" elected officials or political parties. *Id.,* at 359; see *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 297 (2003) (KENNEDY, J., concurring in judgment in part and dissenting in part). And because the Government's interest in preventing the appearance of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access. See *Citizens United*, 558 U. S., at 360.

The dissent advocates a broader conception of corruption, and would apply the label to any individual contributions above limits deemed necessary to protect "collective speech." Thus, under the dissent's view, it is perfectly fine to contribute $5,200 to nine candidates but somehow corrupt to give the same amount to a tenth.

It is fair to say, as Justice Stevens has, "that we have not always spoken about corruption in a clear or consistent voice." *Id.,* at 447 (opinion concurring in part and dissenting in part). The definition of corruption that we apply today, however, has firm roots in *Buckley* itself. The Court in that case upheld base contribution limits because they targeted "the danger of actual *quid pro quo* arrangements" and "the impact of the appearance of corruption stemming from public awareness" of such a system of unchecked direct contributions. 424 U. S., at 27. *Buckley* simultaneously rejected limits on spending that was less likely to "be given as a *quid pro quo* for improper commitments from the candidate." *Id.,* at 47. In any event, this case is not the first in which the debate over the proper breadth of the Government's anticorruption interest has been engaged. Compare *Citizens United*, 558 U. S., at 356–361 (majority opinion), with *id.,* at 447–460 (opinion of Stevens, J.).

The line between *quid pro quo* corruption and general influence may seem vague at times, but the distinction must be respected in order to safeguard basic First Amendment rights. In addition, "[i]n drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Federal Election Comm'n* v. *Wisconsin Right to Life*, 551 U. S. 449, 457 (2007) (opinion of Rᴏʙᴇʀᴛs, C. J.).

The dissent laments that our opinion leaves only remnants of FECA and BCRA that are inadequate to combat corruption. See *post,* at 2. Such rhetoric ignores the fact that we leave the base limits undisturbed.[6] Those base

---

[6] The fact that this opinion does not address the base limits also belies the dissent's concern that we have silently overruled the Court's holding in *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93 (2003). See *post,* at 12–13. At issue in *McConnell* was BCRA's extension of the base limits to so-called "soft money"—previously unregulated contributions to national party committees. See 540 U. S., at 142; see also *post,*

limits remain the primary means of regulating campaign contributions—the obvious explanation for why the aggregate limits received a scant few sentences of attention in *Buckley*.[7]

### B

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States* v. *Playboy Entertainment Group, Inc.*, 529 U. S., at 816. Here, the Government seeks to carry that burden by arguing that the aggregate limits further the permissible objective of preventing *quid pro quo* corruption.

The difficulty is that once the aggregate limits kick in, they ban all contributions of *any* amount. But Congress's selection of a $5,200 base limit indicates its belief that contributions of that amount or less do not create a cognizable risk of corruption. If there is no corruption concern in giving nine candidates up to $5,200 each, it is difficult to understand how a tenth candidate can be regarded as corruptible if given $1,801, and all others cor-

———————

at 31–38 (appendix A to opinion of BREYER, J.) (excerpts from *McConnell* record discussing unregulated "soft money"). Our holding about the constitutionality of the aggregate limits clearly does not overrule *McConnell*'s holding about "soft money."

[7] It would be especially odd to regard aggregate limits as essential to enforce base limits when state campaign finance schemes typically include base limits but not aggregate limits. Just eight of the 38 States that have imposed base limits on contributions from individuals to candidates have also imposed aggregate limits (excluding restrictions on a specific subset of donors). See Conn. Gen. Stat. §9–611(c) (2013); Me. Rev. Stat. Ann., Tit. 21–A, §1015(3) (Supp. 2013); Md. Elec. Law Code Ann. §13–226(b) (Lexis Supp. 2013); Mass. Gen. Laws, ch. 55, §7A(a)(5) (West 2012); N. Y. Elec. Law Ann. §14–114(8) (West Supp. 2013); R. I. Gen. Laws §17–25–10.1(a)(1) (Lexis 2013); Wis. Stat. §11.26(4) (2007–2008); Wyo. Stat. Ann. §22–25–102(c)(ii) (2013). The Government presents no evidence concerning the circumvention of base limits from the 30 States with base limits but no aggregate limits.

ruptible if given a dime. And if there is no risk that additional candidates will be corrupted by donations of up to $5,200, then the Government must defend the aggregate limits by demonstrating that they prevent circumvention of the base limits.

The problem is that they do not serve that function in any meaningful way. In light of the various statutes and regulations currently in effect, *Buckley*'s fear that an individual might "contribute massive amounts of money to a particular candidate through the use of unearmarked contributions" to entities likely to support the candidate, 424 U. S., at 38, is far too speculative. And— importantly—we "have never accepted mere conjecture as adequate to carry a First Amendment burden." *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 392 (2000).

As an initial matter, there is not the same risk of *quid pro quo* corruption or its appearance when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly. When an individual contributes to a candidate, a party committee, or a PAC, the individual must by law cede control over the funds. See 2 U. S. C. §441a(a)(8); 11 CFR §110.6. The Government admits that if the funds are subsequently rerouted to a particular candidate, such action occurs at the initial recipient's discretion—not the donor's. See Brief for Appellee 37. As a consequence, the chain of attribution grows longer, and any credit must be shared among the various actors along the way. For those reasons, the risk of *quid pro quo* corruption is generally applicable only to "the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder." *McConnell*, 540 U. S., at 310 (opinion of KENNEDY, J.).

*Buckley* nonetheless focused on the possibility that "unearmarked contributions" could eventually find their way to a candidate's coffers. 424 U. S., at 38. Even ac-

cepting the validity of *Buckley*'s circumvention theory, it is hard to see how a candidate today could receive a "massive amount[ ] of money" that could be traced back to a particular contributor uninhibited by the aggregate limits. *Ibid.* The Government offers a series of scenarios in support of that possibility. But each is sufficiently implausible that the Government has not carried its burden of demonstrating that the aggregate limits further its anticircumvention interest.

The primary example of circumvention, in one form or another, envisions an individual donor who contributes the maximum amount under the base limits to a particular candidate, say, Representative Smith. Then the donor also channels "massive amounts of money" to Smith through a series of contributions to PACs that have stated their intention to support Smith. See, *e.g.,* Brief for Appellee 35–37; Tr. of Oral Arg. 4, 6.

Various earmarking and antiproliferation rules disarm this example. Importantly, the donor may not contribute to the most obvious PACs: those that support only Smith. See 11 CFR §110.1(h)(1); see also §102.14(a). Nor may the donor contribute to the slightly less obvious PACs that he knows will route "a substantial portion" of his contribution to Smith. §110.1(h)(2).

The donor must instead turn to other PACs that are likely to give to Smith. When he does so, however, he discovers that his contribution will be significantly diluted by all the contributions from others to the same PACs. After all, the donor cannot give more than $5,000 to a PAC and so cannot dominate the PAC's total receipts, as he could when *Buckley* was decided. 2 U. S. C. §441a(a)(1)(C). He cannot retain control over his contribution, 11 CFR §110.1(h)(3), direct his money "in any way" to Smith, 2 U. S. C. §441a(a)(8), or even *imply* that he would like his money to be recontributed to Smith, 11 CFR §110.6(b)(1). His salience as a Smith supporter has been

diminished, and with it the potential for corruption.

It is not clear how many candidates a PAC must support before our dedicated donor can avoid being tagged with the impermissible knowledge that "a substantial portion" of his contribution will go to Smith. But imagine that the donor is one of ten equal donors to a PAC that gives the highest possible contribution to Smith.[8]  The PAC may give no more than $2,600 per election to Smith.  Of that sum, just $260 will be attributable to the donor intent on circumventing the base limits.  Thus far he has hardly succeeded in funneling "massive amounts of money" to Smith.  *Buckley*, *supra*, at 38.

But what if this donor does the same thing via, say, 100 different PACs?  His $260 contribution will balloon to $26,000, ten times what he may contribute directly to Smith in any given election.

This 100-PAC scenario is highly implausible.  In the first instance, it is not true that the individual donor will necessarily have access to a sufficient number of PACs to effectuate such a scheme.  There are many PACs, but they are not limitless.  For the 2012 election cycle, the FEC reported about 2,700 nonconnected PACs (excluding PACs that finance independent expenditures only).  And not every PAC that supports Smith will work in this scheme: For our donor's pro rata share of a PAC's contribution to Smith to remain meaningful, the PAC must be funded by only a small handful of donors.  The antiproliferation rules, which were not in effect when *Buckley* was decided, prohibit our donor from creating 100 pro-Smith PACs of his own, or collaborating with the nine other donors to do

---

[8] Even those premises are generous because they assume that the donor contributes to non-multicandidate PACs, which are relatively rare.  Multicandidate PACs, by contrast, must have more than 50 contributors.  11 CFR §100.5(e)(3).  The more contributors, of course, the more the donor's share in any eventual contribution to Smith is diluted.

so.  See 2 U. S. C. §441a(a)(5) ("all contributions made by political committees established or financed or maintained or controlled by . . . any other person, or by any group of such persons, shall be considered to have been made by a single political committee").

Moreover, if 100 PACs were to contribute to Smith and few other candidates, and if specific individuals like our ardent Smith supporter were to contribute to each, the FEC could weigh those "circumstantial factors" to determine whether to deem the PACs affiliated.  11 CFR §100.5(g)(4)(ii).  The FEC's analysis could take account of a "common or overlapping membership" and "similar patterns of contributions or contributors," among other considerations.  §§100.5(g)(4)(ii)(D), (J).  The FEC has in the past initiated enforcement proceedings against contributors with such suspicious patterns of PAC donations.  See, *e.g.,* Conciliation Agreement, *In re Riley*, Matters Under Review 4568, 4633, 4634, 4736 (FEC, Dec. 19, 2001).

On a more basic level, it is hard to believe that a rational actor would engage in such machinations.  In the example described, a dedicated donor spent $500,000—donating the full $5,000 to 100 different PACs—to add just $26,000 to Smith's campaign coffers.  That same donor, meanwhile, could have spent unlimited funds on independent expenditures on behalf of Smith.  See *Buckley*, 424 U. S., at 44–51.  Indeed, he could have spent his entire $500,000 advocating for Smith, without the risk that his selected PACs would choose not to give to Smith, or that he would have to share credit with other contributors to the PACs.

We have said in the context of independent expenditures that "'[t]he absence of prearrangement and coordination of an expenditure with the candidate or his agent . . . undermines the value of the expenditure to the candidate.'" *Citizens United*, 558 U. S., at 357 (quoting *Buckley, supra*, at 47).  But probably not by 95 percent.  And at least from

the *donor's* point of view, it strikes us as far more likely that he will want to see his full $500,000 spent on behalf of his favored candidate—even if it must be spent independently—rather than see it diluted to a small fraction so that it can be contributed directly by someone else.[9]

Another circumvention example is the one that apparently motivated the District Court. As the District Court crafted the example, a donor gives a $500,000 check to a joint fundraising committee composed of a candidate, a national party committee, and "most of the party's state party committees" (actually, 47 of the 50). 893 F. Supp. 2d, at 140. The committees divide up the money so that each one receives the maximum contribution permissible under the base limits, but then each transfers its allocated portion to the same single committee. That committee uses the money for coordinated expenditures on behalf of a particular candidate. If that scenario "seem[s] unlikely," the District Court thought so, too. *Ibid.* But because the District Court could "imagine" that chain of events, it held that the example substantiated the Government's circumvention concerns. *Ibid.*

One problem, however, is that the District Court's speculation relies on illegal earmarking. Lest there be any confusion, a joint fundraising committee is simply a mechanism for individual committees to raise funds collectively, not to circumvent base limits or earmarking rules. See 11

_____

[9] The Justice Department agrees. As Acting Assistant Attorney General Mythili Raman recently testified before Congress: "We anticipate seeing fewer cases of conduit contributions directly to campaign committees or parties, because individuals or corporations who wish to influence elections or officials will no longer need to attempt to do so through conduit contribution schemes that can be criminally prosecuted. Instead, they are likely to simply make unlimited contributions to Super PACs or 501(c)s." Hearing on Current Issues in Campaign Finance Law Enforcement before the Subcommittee on Crime and Terrorism of the Senate Committee on the Judiciary, 113th Cong., 1st Sess., 3 (2013).

CFR §102.17(c)(5). Under no circumstances may a contribution to a joint fundraising committee result in an allocation that exceeds the contribution limits applicable to its constituent parts; the committee is in fact required to return any excess funds to the contributor. See §102.17(c)(6)(i).

The District Court assumed compliance with the specific allocation rules governing joint fundraising committees, but it expressly based its example on the premise that the donor would telegraph his desire to support one candidate and that "many separate entities would willingly serve as conduits for a single contributor's interests." 893 F. Supp. 2d, at 140. Regardless whether so many distinct entities would cooperate as a practical matter, the earmarking provision prohibits an individual from directing funds "through an intermediary or conduit" to a particular candidate. 2 U. S. C. §441a(8). Even the "implicit[ ]" agreement imagined by the District Court, 893 F. Supp. 2d, at 140, would trigger the earmarking provision. See 11 CFR §110.6(b)(1). So this circumvention scenario could not succeed without assuming that nearly 50 separate party committees would engage in a transparent violation of the earmarking rules (and that they would not be caught if they did).

Moreover, the District Court failed to acknowledge that its $500,000 example cannot apply to most candidates. It crafted the example around a presidential candidate, for whom donations in the thousands of dollars may not seem remarkable—especially in comparison to the nearly $1.4 billion spent by the 2012 presidential candidates. The same example cannot, however, be extrapolated to most House and Senate candidates. Like contributions, coordinated expenditures are limited by statute, with different limits based on the State and the office. See 2 U. S. C. §441a(d)(3). The 2013 coordinated expenditure limit for most House races is $46,600, well below the $500,000 in

coordinated expenditures envisioned by the District Court. The limit for Senate races varies significantly based on state population. See 78 Fed. Reg. 8531 (2013). A scheme of the magnitude imagined by the District Court would be possible even in theory for *no* House candidates and the Senate candidates from just the 12 most populous States. *Ibid.*

Further, to the extent that the law does not foreclose the scenario described by the District Court, experience and common sense do. The Government provides no reason to believe that many state parties would willingly participate in a scheme to funnel money to another State's candidates. A review of FEC data of Republican and Democratic state party committees for the 2012 election cycle reveals just 12 total instances in which a state party committee contributed to a House or Senate candidate in another State. No surprise there. The Iowa Democratic Party, for example, has little reason to transfer money to the California Democratic Party, especially when the Iowa Democratic Party would be barred for the remainder of the election cycle from receiving another contribution for its own activities from the particular donor.

These scenarios, along with others that have been suggested, are either illegal under current campaign finance laws or divorced from reality. The three examples posed by the dissent are no exception. The dissent does not explain how the large sums it postulates can be legally rerouted to a particular candidate, why most state committees would participate in a plan to redirect their donations to a candidate in another State, or how a donor or group of donors can avoid regulations prohibiting contributions to a committee "with the knowledge that a substantial portion" of the contribution will support a candidate to whom the donor has already contributed, 11 CFR §110.1(h)(2).

The dissent argues that such knowledge may be difficult

to prove, pointing to eight FEC cases that did not proceed because of insufficient evidence of a donor's incriminating knowledge. See *post,* at 24–25. It might be that such guilty knowledge could not be shown because the donors were not guilty—a possibility that the dissent does not entertain. In any event, the donors described in those eight cases were typically alleged to have exceeded the base limits by $5,000 or less. The FEC's failure to find the requisite knowledge in those cases hardly means that the agency will be equally powerless to prevent a scheme in which a donor routes *millions of dollars* in excess of the base limits to a particular candidate, as in the dissent's "Example Two." And if an FEC official cannot establish knowledge of circumvention (or establish affiliation) when the same ten donors contribute $10,000 each to 200 newly created PACs, and each PAC writes a $10,000 check to the same ten candidates—the dissent's "Example Three"— then that official has not a heart but a head of stone. See *post,* at 19–20, 25.

The dissent concludes by citing three briefs for the proposition that, even with the aggregate limits in place, individuals "have transferred large sums of money to specific candidates" in excess of the base limits. *Post,* at 26. But the cited sources do not provide any real-world examples of circumvention of the base limits along the lines of the various hypotheticals. The dearth of FEC prosecutions, according to the dissent, proves only that people are getting away with it. And the violations that surely must be out there elude detection "because in the real world, the methods of achieving circumvention are more subtle and more complex" than the hypothetical examples. *Ibid.* This sort of speculation, however, cannot justify the substantial intrusion on First Amendment rights at issue in this case.

*Buckley* upheld aggregate limits only on the ground that they prevented channeling money to candidates beyond

the base limits. The absence of such a prospect today belies the Government's asserted objective of preventing corruption or its appearance. The improbability of circumvention indicates that the aggregate limits instead further the impermissible objective of simply limiting the amount of money in political campaigns.

C

Quite apart from the foregoing, the aggregate limits violate the First Amendment because they are not "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U. S., at 25. In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Board of Trustees of State Univ. of N. Y.* v. *Fox*, 492 U. S. 469, 480 (1989) (quoting *In re R. M. J.*, 455 U. S. 191, 203 (1982)). Here, because the statute is poorly tailored to the Government's interest in preventing circumvention of the base limits, it impermissibly restricts participation in the political process.

1

The Government argues that the aggregate limits are justified because they prevent an individual from giving to too many initial recipients who might subsequently recontribute a donation. After all, only recontributed funds can conceivably give rise to circumvention of the base limits. Yet all indications are that many types of recipients have scant interest in regifting donations they receive.

Some figures might be useful to put the risk of circumvention in perspective. We recognize that no data can be

marshaled to capture perfectly the counterfactual world in which aggregate limits do not exist. But, as we have noted elsewhere, we can nonetheless ask "whether experience under the present law confirms a serious threat of abuse." *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 457 (2001). It does not. Experience suggests that the vast majority of contributions made in excess of the aggregate limits are likely to be retained and spent by their recipients rather than rerouted to candidates.

In the 2012 election cycle, federal candidates, political parties, and PACs spent a total of $7 billion, according to the FEC. In particular, each national political party's spending ran in the hundreds of millions of dollars. The National Republican Senatorial Committee (NRSC), National Republican Congressional Committee (NRCC), Democratic Senatorial Campaign Committee (DSCC), and Democratic Congressional Campaign Committee (DCCC), however, spent less than $1 million each on direct candidate contributions and less than $10 million each on coordinated expenditures. Brief for NRSC et al. as *Amici Curiae* 23, 25 (NRSC Brief). Including both coordinated expenditures and direct candidate contributions, the NRSC and DSCC spent just 7% of their total funds on contributions to candidates and the NRCC and DCCC spent just 3%.

Likewise, as explained previously, state parties rarely contribute to candidates in other States. In the 2012 election cycle, the Republican and Democratic state party committees in all 50 States (and the District of Columbia) contributed a paltry $17,750 to House and Senate candidates in other States. The state party committees spent over half a billion dollars over the same time period, of which the $17,750 in contributions to other States' candidates constituted just 0.003%.

As with national and state party committees, candidates

contribute only a small fraction of their campaign funds to other candidates. Authorized candidate committees may support other candidates up to a $2,000 base limit. 2 U. S. C. §432(e)(3)(B). In the 2012 election, House candidates spent a total of $1.1 billion. Candidate-to-candidate contributions among House candidates totaled $3.65 million, making up just 0.3% of candidates' overall spending. NRSC Brief 29. The most that any one individual candidate received from all other candidates was around $100,000. Brief for Appellee 39. The fact is that candidates who receive campaign contributions spend most of the money on themselves, rather than passing along donations to other candidates. In this arena at least, charity begins at home.[10]

Based on what we can discern from experience, the indiscriminate ban on all contributions above the aggregate limits is disproportionate to the Government's interest in preventing circumvention. The Government has not given us any reason to believe that parties or candidates would dramatically shift their priorities if the aggregate limits were lifted. Absent such a showing, we cannot conclude that the sweeping aggregate limits are appropriately tailored to guard against any contributions that might implicate the Government's anticircumvention interest.

A final point: It is worth keeping in mind that the *base limits* themselves are a prophylactic measure. As we have

---

[10] In addition, the percentage of contributions above the aggregate limits that even *could* be used for circumvention is limited by the fact that many of the modes of potential circumvention can be used only once each election. For example, if one donor gives $2,600 to 100 candidates with safe House seats in the hopes that each candidate will reroute $2,000 to Representative Smith, a candidate in a contested district, no other donor can do the same, because the candidates in the safe seats will have exhausted their permissible contributions to Smith. So there is no risk that the circumvention scheme will repeat itself with multiple other would-be donors to Smith.

explained, "restrictions on direct contributions are preventative, because few if any contributions to candidates will involve *quid pro quo* arrangements." *Citizens United*, 558 U. S., at 357. The aggregate limits are then layered on top, ostensibly to prevent circumvention of the base limits. This "prophylaxis-upon-prophylaxis approach" requires that we be particularly diligent in scrutinizing the law's fit. *Wisconsin Right to Life*, 551 U. S., at 479 (opinion of ROBERTS, C. J.); see *McConnell*, 540 U. S., at 268–269 (opinion of THOMAS, J.).

2

Importantly, there are multiple alternatives available to Congress that would serve the Government's anticircumvention interest, while avoiding "unnecessary abridgment" of First Amendment rights. *Buckley*, 424 U. S., at 25.

The most obvious might involve targeted restrictions on transfers among candidates and political committees. There are currently no such limits on transfers among party committees and from candidates to party committees. See 2 U. S. C. §441a(a)(4); 11 CFR §113.2(c). Perhaps for that reason, a central concern of the District Court, the Government, multiple *amici curiae*, and the dissent has been the ability of party committees to transfer money freely. If Congress agrees that this is problematic, it might tighten its permissive transfer rules. Doing so would impose a lesser burden on First Amendment rights, as compared to aggregate limits that flatly ban contributions beyond certain levels. And while the Government has not conceded that transfer restrictions would be a perfect substitute for the aggregate limits, it has recognized that they would mitigate the risk of circumvention. See Tr. of Oral Arg. 29.

One possible option for restricting transfers would be to require contributions above the current aggregate limits to be deposited into segregated, nontransferable accounts

and spent only by their recipients.  Such a solution would address the same circumvention possibilities as the current aggregate limits, while not completely barring contributions beyond the aggregate levels.  In addition (or as an alternative), if Congress believes that circumvention is especially likely to occur through creation of a joint fundraising committee, it could require that funds received through those committees be spent by their recipients (or perhaps it could simply limit the size of joint fundraising committees).  Such alternatives to the aggregate limits properly refocus the inquiry on the delinquent actor: the recipient of a contribution within the base limits, who then routes the money in a manner that undermines those limits.  See *Citizens United*, *supra*, at 360–361; cf. *Bartnicki* v. *Vopper*, 532 U. S. 514, 529–530 (2001).

Indeed, Congress has adopted transfer restrictions, and the Court has upheld them, in the context of state party spending.  See 2 U. S. C. §441i(b).  So-called "Levin funds" are donations permissible under state law that may be spent on certain federal election activity—namely, voter registration and identification, get-out-the-vote efforts, or generic campaign activities.  Levin funds are raised directly by the state or local party committee that ultimately spends them.  §441i(b)(2)(B)(iv).  That means that other party committees may not transfer Levin funds, solicit Levin funds on behalf of the particular state or local committee, or engage in joint fundraising of Levin funds.  See *McConnell*, 540 U. S., at 171–173.  *McConnell* upheld those transfer restrictions as "justifiable anticircumvention measures," though it acknowledged that they posed some associational burdens.  *Id.,* at 171.  Here, a narrow transfer restriction on contributions that could otherwise be recontributed in excess of the base limits could rely on a similar justification.

Other alternatives might focus on earmarking.  Many of the scenarios that the Government and the dissent hy-

pothesize involve at least implicit agreements to circumvent the base limits—agreements that are already prohibited by the earmarking rules. See 11 CFR §110.6. The FEC might strengthen those rules further by, for example, defining how many candidates a PAC must support in order to ensure that "a substantial portion" of a donor's contribution is not rerouted to a certain candidate. §110.1(h)(2). Congress might also consider a modified version of the aggregate limits, such as one that prohibits donors who have contributed the current maximum sums from further contributing to political committees that have indicated they will support candidates to whom the donor has already contributed. To be sure, the existing earmarking provision does not define "the outer limit of acceptable tailoring." *Colorado Republican Federal Campaign Comm.*, 533 U. S., at 462. But tighter rules could have a significant effect, especially when adopted in concert with other measures.

We do not mean to opine on the validity of any particular proposal. The point is that there are numerous alternative approaches available to Congress to prevent circumvention of the base limits.

## D

Finally, disclosure of contributions minimizes the potential for abuse of the campaign finance system. Disclosure requirements are in part "justified based on a governmental interest in 'provid[ing] the electorate with information' about the sources of election-related spending." *Citizens United*, 558 U. S., at 367 (quoting *Buckley*, *supra*, at 66). They may also "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.,* at 67. Disclosure requirements burden speech, but—unlike the aggregate limits—they do not impose a ceiling on speech. *Citizens United*, *supra,* at 366; but see *McConnell*, *supra*,

at 275–277 (opinion of THOMAS, J.). For that reason, disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech. See, *e.g., Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 262 (1986).

With modern technology, disclosure now offers a particularly effective means of arming the voting public with information. In 1976, the Court observed that Congress could regard disclosure as "only a partial measure." *Buckley*, 424 U. S., at 28. That perception was understandable in a world in which information about campaign contributions was filed at FEC offices and was therefore virtually inaccessible to the average member of the public. See Brief for Cause of Action Institute as *Amicus Curiae* 15–16. Today, given the Internet, disclosure offers much more robust protections against corruption. See *Citizens United*, *supra,* at 370–371. Reports and databases are available on the FEC's Web site almost immediately after they are filed, supplemented by private entities such as OpenSecrets.org and FollowTheMoney.org. Because massive quantities of information can be accessed at the click of a mouse, disclosure is effective to a degree not possible at the time *Buckley*, or even *McConnell*, was decided.

The existing aggregate limits may in fact encourage the movement of money away from entities subject to disclosure. Because individuals' direct contributions are limited, would-be donors may turn to other avenues for political speech. See *Citizens United*, *supra*, at 364. Individuals can, for example, contribute unlimited amounts to 501(c) organizations, which are not required to publicly disclose their donors. See 26 U. S. C. §6104(d)(3). Such organizations spent some $300 million on independent expenditures in the 2012 election cycle.

## V

At oral argument, the Government shifted its focus from

*Buckley*'s anticircumvention rationale to an argument that the aggregate limits deter corruption regardless of their ability to prevent circumvention of the base limits. See Tr. of Oral Arg. 29–30, 50–52. The Government argued that there is an opportunity for corruption whenever a large check is given to a legislator, even if the check consists of contributions within the base limits to be appropriately divided among numerous candidates and committees. The aggregate limits, the argument goes, ensure that the check amount does not become too large. That new rationale for the aggregate limits—embraced by the dissent, see *post,* at 15–17—does not wash. It dangerously broadens the circumscribed definition of *quid pro quo* corruption articulated in our prior cases, and targets as corruption the general, broad-based support of a political party.

In analyzing the base limits, *Buckley* made clear that the risk of corruption arises when an individual makes large contributions to the candidate or officeholder himself. See 424 U. S*.,* at 26–27. *Buckley*'s analysis of the aggregate limit under FECA was similarly confined. The Court noted that the aggregate limit guarded against an individual's funneling—through circumvention—"massive amounts of money to *a particular candidate.*" *Id.,* at 38 (emphasis added). We have reiterated that understanding several times. See, *e.g., National Conservative Political Action Comm.*, 470 U. S., at 497 (*quid pro quo* corruption occurs when "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to *themselves* or infusions of money into *their* campaigns" (emphasis added)); *Citizens Against Rent Control/Coalition for Fair Housing* v. *Berkeley*, 454 U. S. 290, 297 (1981) (*Buckley*'s holding that contribution limits are permissible "relates to the perception of undue influence of large contributors to a *candidate*"); *McConnell*, 540 U. S., at 296 (opinion of KENNEDY, J.) (*quid pro quo* corruption in *Buckley* involved "contributions that flowed to *a*

*particular candidate's* benefit" (emphasis added)).

Of course a candidate would be pleased with a donor who contributed not only to the candidate himself, but also to other candidates from the same party, to party committees, and to PACs supporting the party. But there is a clear, administrable line between money beyond the base limits funneled in an identifiable way to a candidate—for which the candidate feels obligated—and money within the base limits given widely to a candidate's party—for which the candidate, like all other members of the party, feels grateful.

When donors furnish widely distributed support within all applicable base limits, all members of the party or supporters of the cause may benefit, and the leaders of the party or cause may feel particular gratitude. That gratitude stems from the basic nature of the party system, in which party members join together to further common political beliefs, and citizens can choose to support a party because they share some, most, or all of those beliefs. See *Tashjian* v. *Republican Party of Conn.*, 479 U. S. 208, 214–216 (1986). To recast such shared interest, standing alone, as an opportunity for *quid pro quo* corruption would dramatically expand government regulation of the political process. Cf. *California Democratic Party* v. *Jones*, 530 U. S. 567, 572–573 (2000) (recognizing the Government's "role to play in structuring and monitoring the election process," but rejecting "the proposition that party affairs are public affairs, free of First Amendment protections").

The Government suggests that it is the *solicitation* of large contributions that poses the danger of corruption, see Tr. of Oral Arg. 29–30, 38–39, 50–51; see also *post,* at 15–16, 20, but the aggregate limits are not limited to any direct solicitation by an officeholder or candidate. Cf. *McConnell, supra,* at 298–299, 308 (opinion of KENNEDY, J.) (rejecting a ban on "soft money" contributions to national parties, but approving a ban on the solicitation of

such contributions as "a direct and necessary regulation of federal candidates' and officeholders' receipt of *quids*"). We have no occasion to consider a law that would specifically ban candidates from soliciting donations—within the base limits—that would go to many other candidates, and would add up to a large sum. For our purposes here, it is enough that the aggregate limits at issue are not directed specifically to candidate behavior.

\*　　\*　　\*

For the past 40 years, our campaign finance jurisprudence has focused on the need to preserve authority for the Government to combat corruption, without at the same time compromising the political responsiveness at the heart of the democratic process, or allowing the Government to favor some participants in that process over others. As Edmund Burke explained in his famous speech to the electors of Bristol, a representative owes constituents the exercise of his "mature judgment," but judgment informed by "the strictest union, the closest correspondence, and the most unreserved communication with his constituents." The Speeches of the Right Hon. Edmund Burke 129–130 (J. Burke ed. 1867). Constituents have the right to support candidates who share their views and concerns. Representatives are not to follow constituent orders, but can be expected to be cognizant of and responsive to those concerns. Such responsiveness is key to the very concept of self-governance through elected officials.

The Government has a strong interest, no less critical to our democratic system, in combatting corruption and its appearance. We have, however, held that this interest must be limited to a specific kind of corruption—*quid pro quo* corruption—in order to ensure that the Government's efforts do not have the effect of restricting the First Amendment right of citizens to choose who shall govern them. For the reasons set forth, we conclude that the

aggregate limits on contributions do not further the only governmental interest this Court accepted as legitimate in *Buckley*. They instead intrude without justification on a citizen's ability to exercise "the most fundamental First Amendment activities." *Buckley*, 424 U. S., at 14.

The judgment of the District Court is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 12–536

_____

SHAUN McCUTCHEON, ET AL., APPELLANTS *v.*
FEDERAL ELECTION COMMISSION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[April 2, 2014]

JUSTICE THOMAS, concurring in the judgment.

I adhere to the view that this Court's decision in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (*per curiam*), denigrates core First Amendment speech and should be overruled. See *Randall* v. *Sorrell*, 548 U. S. 230, 265–267 (2006) (THOMAS, J., concurring in judgment); *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 164–165 (2003) (THOMAS, J., dissenting); *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 465–466 (2001) (*Colorado II*) (THOMAS, J., dissenting); *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 412–420 (2000) (THOMAS, J., dissenting); *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 635–640 (1996) (*Colorado I*) (THOMAS, J., concurring in judgment and dissenting in part).

Political speech is "'the primary object of First Amendment protection'" and "the lifeblood of a self-governing people." *Colorado II*, *supra,* at 465–466 (THOMAS, J., dissenting). Contributions to political campaigns, no less than direct expenditures, "generate essential political speech" by fostering discussion of public issues and candidate qualifications. *Shrink Missouri*, *supra,* at 412 (THOMAS, J., dissenting); see also *id.,* at 410–411. *Buckley* itself recognized that both contribution and expenditure

limits "operate in an area of the most fundamental First Amendment activities" and "implicate fundamental First Amendment interests." 424 U. S., at 14, 23. But instead of treating political giving and political spending alike, *Buckley* distinguished the two, embracing a bifurcated standard of review under which contribution limits receive less rigorous scrutiny. *Id.,* at 25.

As I have explained before, "[t]he analytic foundation of *Buckley* . . . was tenuous from the very beginning and has only continued to erode in the intervening years." *Shrink Missouri, supra,* at 412 (THOMAS, J., dissenting). To justify a lesser standard of review for contribution limits, *Buckley* relied on the premise that contributions are different in kind from direct expenditures. None of the Court's bases for that premise withstands careful review. The linchpin of the Court's analysis was its assertion that "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." 424 U. S., at 21. But that "'speech by proxy'" rationale quickly breaks down, given that "[e]ven in the case of a direct expenditure, there is usually some go-between that facilitates the dissemination of the spender's message—for instance, an advertising agency or a television station." *Colorado I, supra,* at 638–639 (opinion of THOMAS, J.). Moreover, we have since rejected the "'proxy speech'" approach as affording insufficient First Amendment protection to "the voices of those of modest means as opposed to those sufficiently wealthy to be able to buy expensive media ads with their own resources." *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480, 495 (1985); see *Shrink Missouri, supra,* at 413–414 (THOMAS, J., dissenting).

The remaining justifications *Buckley* provided are also flawed. For example, *Buckley* claimed that contribution

limits entail only a "marginal" speech restriction because "[a] contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support." 424 U. S., at 20, 21. But this Court has never required a speaker to explain the reasons for his position in order to obtain full First Amendment protection. Instead, we have consistently held that speech is protected even "when the underlying basis for a position is not given." *Shrink Missouri, supra,* at 415, n. 3 (THOMAS, J., dissenting); see, *e.g., City of Ladue* v. *Gilleo,* 512 U. S. 43, 46 (1994) (sign reading "For Peace in the Gulf"); *Texas* v. *Johnson,* 491 U. S. 397, 415–416 (1989) (flag burning); *Tinker* v. *Des Moines Independent Community School Dist.,* 393 U. S. 503, 510–511 (1969) (black armband signifying opposition to Vietnam War); see also *Colorado I, supra,* at 640 (opinion of THOMAS, J.) ("Even a pure message of support, unadorned with reasons, is valuable to the democratic process")

Equally unpersuasive is *Buckley*'s suggestion that contribution limits warrant less stringent review because "[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution," and "[a]t most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate." 424 U. S., at 21. Contributions do increase the quantity of communication by "amplifying the voice of the candidate" and "help[ing] to ensure the dissemination of the messages that the contributor wishes to convey." *Shrink Missouri, supra*, at 415 (THOMAS, J., dissenting). They also serve as a quantifiable metric of the intensity of a particular contributor's support, as demonstrated by the frequent practice of giving different amounts to different candidates. *Buckley* simply failed to recognize that "we have accorded full First Amendment protection to expressions of intensity." *Id.*, at 415, n. 3; see also *Cohen* v. *California,* 403 U. S. 15, 25–26 (1971)

(protecting the use of an obscenity for emphasis).

Although today's decision represents a faithful application of our precedents, the plurality's discussion of *Buckley* omits any reference to these discarded rationales. Instead, the plurality alludes only to *Buckley*'s last remaining reason for devaluing political contributions relative to expenditures. See *ante*, at 8 (quoting *Buckley*, 424 U. S., at 21). The relevant sentence from *Buckley* reads as follows:

> "A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Ibid.*

That proposition, read in full, cannot be squared with a key premise of today's decision.

Among the Government's justifications for the aggregate limits set forth in the Bipartisan Campaign Reform Act of 2002 (BCRA) is that "an individual can engage in the 'symbolic act of contributing' to as many entities as he wishes." Brief for Appellee 20. That is, the Government contends that aggregate limits are constitutional as long as an individual can still contribute some token amount (a dime, for example) to each of his preferred candidates. The plurality, quite correctly, rejects that argument, noting that "[i]t is no answer to say that the individual can simply contribute less money to more people." *Ante*, at 16. That is so because "[t]o require one person to contribute at lower levels than others because he wants to support more candidates or causes is to impose a special burden on broader participation in the democratic process." *Ibid.*

What the plurality does not recognize is that the same logic also defeats the reasoning from *Buckley* on which the

plurality purports to rely. Under the plurality's analysis, limiting the amount of money a person may give to a candidate *does* impose a direct restraint on his political communication; if it did not, the aggregate limits at issue here would not create "a special burden on broader participation in the democratic process." *Ibid.* I am wholly in agreement with the plurality's conclusion on this point: "[T]he Government may not penalize an individual for 'robustly exercis[ing]' his First Amendment rights." *Ibid.* (quoting *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 739 (2008)). I regret only that the plurality does not acknowledge that today's decision, although purporting not to overrule *Buckley*, continues to chip away at its footings.

In sum, what remains of *Buckley* is a rule without a rationale. Contributions and expenditures are simply "two sides of the same First Amendment coin," and our efforts to distinguish the two have produced mere "word games" rather than any cognizable principle of constitutional law. *Buckley, supra,* at 241, 244 (Burger, C. J., concurring in part and dissenting in part). For that reason, I would overrule *Buckley* and subject the aggregate limits in BCRA to strict scrutiny, which they would surely fail. See *Colorado I*, 518 U. S., at 640–641 (opinion of THOMAS, J.) ("I am convinced that under traditional strict scrutiny, broad prophylactic caps on both spending and giving in the political process . . . are unconstitutional").

This case represents yet another missed opportunity to right the course of our campaign finance jurisprudence by restoring a standard that is faithful to the First Amendment. Until we undertake that reexamination, we remain in a "halfway house" of our own design. *Shrink Missouri*, 528 U. S., at 410 (KENNEDY, J., dissenting). For these reasons, I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

No. 12–536

SHAUN McCUTCHEON, ET AL., APPELLANTS *v.*
FEDERAL ELECTION COMMISSION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[April 2, 2014]

JUSTICE BREYER, with whom JUSTICE GINSBURG, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

Nearly 40 years ago in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) (*per curiam*), this Court considered the constitutionality of laws that imposed limits upon the overall amount a single person can contribute to all federal candidates, political parties, and committees taken together. The Court held that those limits did not violate the Constitution. *Id.,* at 38; accord, *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 138, n. 40, 152–153, n. 48 (2003) (citing with approval *Buckley*'s aggregate limits holding).

The *Buckley* Court focused upon the same problem that concerns the Court today, and it wrote:

"The overall $25,000 ceiling does impose an ultimate restriction upon the number of candidates and committees with which an individual may associate himself by means of financial support. But this quite modest restraint upon protected political activity serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party. The limited, additional restriction on associa-

tional freedom imposed by the overall ceiling is thus no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid."  424 U. S., at 38.

Today a majority of the Court overrules this holding.  It is wrong to do so.  Its conclusion rests upon its own, not a record-based, view of the facts.  Its legal analysis is faulty: It misconstrues the nature of the competing constitutional interests at stake.  It understates the importance of protecting the political integrity of our governmental institutions.  It creates a loophole that will allow a single individual to contribute millions of dollars to a political party or to a candidate's campaign.  Taken together with *Citizens United* v. *Federal Election Comm'n,* 558 U. S. 310 (2010), today's decision eviscerates our Nation's campaign finance laws, leaving a remnant incapable of dealing with the grave problems of democratic legitimacy that those laws were intended to resolve.

I

The plurality concludes that the aggregate contribution limits "'unnecessar[ily] abridg[e]'" First Amendment rights.  *Ante,* at 8, 30 (quoting *Buckley, supra,* at 25).  It notes that some individuals will wish to "spen[d] 'substantial amounts of money in order to communicate [their] political ideas through sophisticated' means." *Ante,* at 14–15 (quoting *Federal Election Comm'n* v. *National Conservative Political Action Comm.*, 470 U. S. 480, 493 (1985) (*NCPAC*)).  Aggregate contribution ceilings limit an individual's ability to engage in such "broader participation in the democratic process," while insufficiently advancing any legitimate governmental objective. *Ante,* at 16, 21–29. Hence, the plurality finds, they violate the Constitution.

The plurality's conclusion rests upon three separate but related claims.  Each is fatally flawed.  First, the plurality says that given the base limits on contributions to candi-

dates and political committees, aggregate limits do not further any independent governmental objective worthy of protection. And that is because, given the base limits, "[s]pending large sums of money in connection with elections" does not "give rise to . . . corruption." *Ante,* at 19. In making this argument, the plurality relies heavily upon a narrow definition of "corruption" that excludes efforts to obtain "'influence over or access to' elected officials or political parties." *Ibid.* (quoting *Citizens United, supra,* at 359); accord, *ante,* at 18–20, 22–29.

Second, the plurality assesses the instrumental objective of the aggregate limits, namely, safeguarding the base limits. It finds that they "do not serve that function in any meaningful way." *Ante,* at 22. That is because, even without the aggregate limits, the possibilities for circumventing the base limits are "implausible" and "divorced from reality." *Ante,* at 23, 24, 28.

Third, the plurality says the aggregate limits are not a "'reasonable'" policy tool. Rather, they are "poorly tailored to the Government's interest in preventing circumvention of the base limits." *Ante,* at 30 (quoting *Board of Trustees of State Univ. of N. Y.* v. *Fox,* 492 U. S. 469, 480 (1989)). The plurality imagines several alternative regulations that it says might just as effectively thwart circumvention. Accordingly, it finds, the aggregate caps are out of "'proportion to the [anticorruption] interest served.'" *Ante,* at 30 (quoting *Fox, supra,* at 480).

## II

The plurality's first claim—that large aggregate contributions do not "give rise" to "corruption"—is plausible only because the plurality defines "corruption" too narrowly. The plurality describes the constitutionally permissible objective of campaign finance regulation as follows: "Congress may target only a specific type of corruption—*'quid pro quo'* corruption." *Ante,* at 19. It then defines *quid pro*

*quo* corruption to mean no more than "a direct exchange of an official act for money"—an act akin to bribery. *Ante,* at 2–3. It adds specifically that corruption does *not* include efforts to "garner 'influence over or access to' elected officials or political parties." *Ante,* at 19 (quoting *Citizens United, supra,* at 359). Moreover, the Government's efforts to prevent the "appearance of corruption" are "equally confined to the appearance of *quid pro quo* corruption," as narrowly defined. *Ante,* at 19. In the plurality's view, a federal statute could not prevent an individual from writing a million dollar check to a political party (by donating to its various committees), because the rationale for any limit would "dangerously broade[n] the circumscribed definition of *quid pro quo* corruption articulated in our prior cases." *Ante,* at 37.

This critically important definition of "corruption" is inconsistent with the Court's prior case law (with the possible exception of *Citizens United,* as I will explain below). It is virtually impossible to reconcile with this Court's decision in *McConnell,* upholding the Bipartisan Campaign Reform Act of 2002 (BCRA). And it misunderstands the constitutional importance of the interests at stake. In fact, constitutional interests—indeed, First Amendment interests—lie on both sides of the legal equation.

## A

In reality, as the history of campaign finance reform shows and as our earlier cases on the subject have recognized, the anticorruption interest that drives Congress to regulate campaign contributions is a far broader, more important interest than the plurality acknowledges. It is an interest in maintaining the integrity of our public governmental institutions. And it is an interest rooted in the Constitution and in the First Amendment itself.

Consider at least one reason why the First Amendment

protects political speech. Speech does not exist in a vacuum. Rather, political communication seeks to secure government action. A politically oriented "marketplace of ideas" seeks to form a public opinion that can and will influence elected representatives.

This is not a new idea. Eighty-seven years ago, Justice Brandeis wrote that the First Amendment's protection of speech was "essential to effective democracy." *Whitney* v. *California*, 274 U. S. 357, 377 (1927) (concurring opinion). Chief Justice Hughes reiterated the same idea shortly thereafter: "A fundamental principle of our constitutional system" is the "maintenance of the opportunity for free political discussion *to the end* that government may be responsive to the will of the people." *Stromberg* v. *California*, 283 U. S. 359, 369 (1931) (emphasis added). In *Citizens United*, the Court stated that "[s]peech is an essential mechanism of democracy, for it is *the means* to hold officials accountable to the people." 558 U. S., at 339 (emphasis added).

The Framers had good reason to emphasize this same connection between political speech and governmental action. An influential 18th-century continental philosopher had argued that in a representative democracy, the people lose control of their representatives between elections, during which interim periods they were "in chains." J. Rousseau, An Inquiry Into the Nature of the Social Contract 265–266 (transl. 1791).

The Framers responded to this criticism both by requiring frequent elections to federal office, and by enacting a First Amendment that would facilitate a "chain of communication between the people, and those, to whom they have committed the exercise of the powers of government." J. Wilson, Commentaries on the Constitution of the United States of America 30–31 (1792). This "chain" would establish the necessary "communion of interests and sympathy of sentiments" between the people and their

representatives, so that public opinion could be channeled into effective governmental action. The Federalist No. 57, p. 386 (J. Cooke ed. 1961) (J. Madison); accord, T. Benton, 1 Abridgement of the Debates of Congress, from 1789 to 1856, p. 141 (1857) (explaining that the First Amendment will strengthen American democracy by giving " 'the people' " a right to " 'publicly address their representatives,' " " 'privately advise them,' " or " 'declare their sentiments by petition to the whole body' " (quoting James Madison)). Accordingly, the First Amendment advances not only the individual's right to engage in political speech, but also the public's interest in preserving a democratic order in which collective speech *matters.*

What has this to do with corruption? It has everything to do with corruption. Corruption breaks the constitutionally necessary "chain of communication" between the people and their representatives. It derails the essential speech-to-government-action tie. Where enough money calls the tune, the general public will not be heard. Insofar as corruption cuts the link between political thought and political action, a free marketplace of political ideas loses its point. That is one reason why the Court has stressed the constitutional importance of Congress' concern that a few large donations not drown out the voices of the many. See, *e.g., Buckley*, 424 U. S., at 26–27.

That is also why the Court has used the phrase "subversion of the political process" to describe circumstances in which "[e]lected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *NCPAC*, 470 U. S., at 497. See also *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 208 (1982) (the Government's interests in preventing corruption "directly implicate the integrity of our electoral process" (internal quotation marks and citation omitted)). See generally R. Post, Citizens Divided: Campaign Fi-

nance Reform and the Constitution 7–16, 80–94 (forthcoming 2014) (arguing that the efficacy of American democracy depends on "electoral integrity" and the responsiveness of public officials to public opinion).

The "appearance of corruption" can make matters worse. It can lead the public to believe that its efforts to communicate with its representatives or to help sway public opinion have little purpose. And a cynical public can lose interest in political participation altogether. See *Nixon* v. *Shrink Missouri Government PAC*, 528 U. S. 377, 390 (2000) ("[T]he cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance"). Democracy, the Court has often said, cannot work unless "the people have faith in those who govern." *United States* v. *Mississippi Valley Generating Co.*, 364 U. S. 520, 562 (1961).

The upshot is that the interests the Court has long described as preventing "corruption" or the "appearance of corruption" are more than ordinary factors to be weighed against the constitutional right to political speech. Rather, they are interests rooted in the First Amendment itself. They are rooted in the constitutional effort to create a democracy responsive to the people—a government where laws reflect the very thoughts, views, ideas, and sentiments, the expression of which the First Amendment protects. Given that end, we can and should understand campaign finance laws as resting upon a broader and more significant constitutional rationale than the plurality's limited definition of "corruption" suggests. We should see these laws as seeking in significant part to strengthen, rather than weaken, the First Amendment. To say this is not to deny the potential for conflict between (1) the need to permit contributions that pay for the diffusion of ideas, and (2) the need to limit payments in order to help maintain the integrity of the electoral process. But that conflict takes place within, not outside, the First Amendment's

boundaries.

## B

Since the kinds of corruption that can destroy the link between public opinion and governmental action extend well beyond those the plurality describes, the plurality's notion of corruption is flatly inconsistent with the basic constitutional rationale I have just described. Thus, it should surprise no one that this Court's case law (*Citizens United* excepted) insists upon a considerably broader definition.

In *Buckley*, for instance, the Court said explicitly that aggregate limits were constitutional because they helped "prevent evasion . . . [through] huge contributions to the candidate's political party," 424 U. S., at 26 (the contrary to what the plurality today seems to believe, see *ante,* at 36–39). Moreover, *Buckley* upheld the base limits in significant part because they helped thwart "the appearance of corruption stemming from public awareness of the opportunities for abuse *inherent in a regime of large individual financial contributions.*" 424 U. S., at 27 (emphasis added). And it said that Congress could reasonably conclude that criminal laws forbidding "the giving and taking of bribes" did *not* adequately "deal with the reality or appearance of corruption." *Id.,* at 28. Bribery laws, the Court recognized, address "only the most blatant and specific attempts of those with money to influence governmental action." *Ibid.* The concern with corruption extends further.

Other cases put the matter yet more strongly. In *Beaumont*, for example, the Court found constitutional a ban on direct contributions by corporations because of the need to prevent corruption, properly "understood not only as *quid pro quo* agreements, but also as undue influence on an officeholder's judgment." *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 155–156 (2003). In *Federal*

*Election Comm'n* v. *Colorado Republican Federal Campaign Comm.,* 533 U. S. 431, 441, 457–460 (2001) (*Colorado II*), the Court upheld limits imposed upon coordinated expenditures among parties and candidates because it found they thwarted corruption and its appearance, again understood as including "undue influence" by wealthy donors. In *Shrink Missouri*, the Court upheld limitations imposed by the Missouri Legislature upon contributions to state political candidates, not only because of the need to prevent bribery, but also because of "the broader threat from politicians too compliant with the wishes of large contributors." 528 U. S., at 389.

### C

Most important, in *McConnell*, this Court considered the constitutionality of the Bipartisan Campaign Reform Act of 2002, an Act that set new limits on "soft money" contributions to political parties. "Soft money" referred to funds that, prior to BCRA, were freely donated to parties for activities other than directly helping elect a federal candidate—activities such as voter registration, "get out the vote" drives, and advertising that did not expressly advocate a federal candidate's election or defeat. 540 U. S., at 122–124. BCRA imposed a new ban on soft money contributions to national party committees, and greatly curtailed them in respect to state and local parties. *Id.,* at 133–134, 161–164.

The Court in *McConnell* upheld these new contribution restrictions under the First Amendment for the very reason the plurality today discounts or ignores. Namely, the Court found they thwarted a significant risk of corruption—understood not as *quid pro quo* bribery, but as privileged access to and pernicious influence upon elected representatives.

In reaching its conclusion in *McConnell*, the Court relied upon a vast record compiled in the District Court. That

record consisted of over 100,000 pages of material and included testimony from more than 200 witnesses. See 251 F. Supp. 2d 176, 209 (DC 2003) (*per curiam*). What it showed, in detail, was the web of relationships and understandings among parties, candidates, and large donors that underlies privileged access and influence. See *McConnell*, 540 U. S., at 146–152, 154–157, 167–171, 182–184. The District Judges in *McConnell* made clear that the record did "*not* contain any evidence of bribery or vote buying in exchange for donations of nonfederal money." 251 F. Supp. 2d, at 481 (opinion of Kollar-Kotelly, J.) (emphasis added). Indeed, no one had identified a "single discrete instance of *quid pro quo* corruption" due to soft money. *Id.,* at 395 (opinion of Henderson, J.). But what the record did demonstrate was that enormous soft money contributions, ranging between \$1 million and \$5 million among the largest donors, enabled wealthy contributors to gain disproportionate "access to federal lawmakers" and the ability to "influenc[e] legislation." *Id.,* at 481 (opinion of Kollar-Kotelly, J.). There was an indisputable link between generous political donations and opportunity after opportunity to make one's case directly to a Member of Congress.

Testimony by elected officials supported this conclusion. See, *e.g.*, *ibid.* ("'Large donors of both hard and soft money receive special treatment'" (Sen. Simpson)); *id.*, at 482 ("'Donations, including soft money donations to political parties, do affect how Congress operates. It's only natural, and happens all too often, that a busy Senator with 10 minutes to spare will spend those minutes returning the call of a large soft money donor'" (Sen. Boren)); *id.*, at 496 ("'At a minimum, large soft money donations purchase an opportunity for the donors to make their case to elected officials . . .'" (Sen. McCain)). Furthermore, testimony from party operatives showed that national political parties had created "major donor programs," through which

they openly "offer[ed] greater access to federal office hold-
ers as the donations gr[e]w larger." *Id.,* at 502. I have
placed in Appendix A more examples of the kind of evi-
dence that filled the District Court record in *McConnell*.

This Court upheld BCRA's limitations on soft money
contributions by relying on just the kind of evidence I have
described. We wrote:

> "The evidence in the record shows that candidates and
> donors alike have in fact exploited the soft-money
> loophole, the former to increase their prospects of
> election and the latter to create debt on the part of of-
> ficeholders . . . . Plaintiffs argue that without concrete
> evidence of an instance in which a federal officeholder
> has actually switched a vote [in exchange for soft
> money] . . . , Congress has not shown that there exists
> real or apparent corruption. . . . *[P]laintiffs conceive of
> corruption too narrowly.* Our cases have firmly estab-
> lished that Congress' legitimate interest extends be-
> yond preventing simple cash-for-votes corruption to
> curbing 'undue influence on an officeholder's judg-
> ment, and the appearance of such influence.'" 540
> U. S., at 146, 149–150 (quoting *Colorado II*, 533 U. S.,
> at 441; emphasis added; paragraphs and paragraph
> breaks omitted).

We specifically rejected efforts to define "corruption" in
ways similar to those the plurality today accepts. We
added:

> "Just as troubling to a functioning democracy as clas-
> sic *quid pro quo* corruption is the danger that office-
> holders will decide issues not on the merits or the
> desires of their constituencies, but according to the
> wishes of those who have made large financial contri-
> butions valued by the officeholder." 540 U. S., at 153.

Insofar as today's decision sets forth a significantly nar-

rower definition of "corruption," and hence of the public's interest in political integrity, it is flatly inconsistent with *McConnell.*

D

One case, however, contains language that offers the plurality support. That case is *Citizens United.* There, as the plurality points out, *ante,* at 19, the Court said that "[w]hen *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption." 558 U. S., at 359. Further, the Court said that *quid pro quo* corruption does not include "influence over or access to elected officials," because " 'generic favoritism or influence theory . . . is at odds with standard First Amendment analyses.' " *Ibid.* (quoting *McConnell, supra,* at 296 (KENNEDY, J., concurring in judgment in part and dissenting in part)).

How should we treat these statements from *Citizens United* now? They are not essential to the Court's holding in the case—at least insofar as it can be read to require federal law to treat corporations and trade unions like individuals when they independently pay for, *e.g.,* television advertising during the last 60 days of a federal election. *Citizens United, supra,* at 365. Taken literally, the statements cited simply refer to and characterize still-earlier Court cases. They do not require the more absolute reading that the plurality here gives them.

More than that. Read as the plurality reads them today, the statements from *Citizens United* about the proper contours of the corruption rationale conflict not just with language in the *McConnell* opinion, but with *McConnell'*s very holding. See *supra,* at 9–11. Did the Court in *Citizens United* intend to overrule *McConnell?* I doubt it, for if it did, the Court or certainly the dissent would have said something about it. The total silence of all opinions in

*Citizens United* with respect to this matter argues strongly in favor of treating the language quoted above as dictum, as an overstatement, or as limited to the context in which it appears. *Citizens United* itself contains language that supports the last mentioned reading, for it says that "[*Buckley*] did not extend this rationale [about the reality or appearance of corruption] to *independent* expenditures, and the Court does not do so here." 558 U. S., at 357 (emphasis added). And it adds that, while "[t]he BCRA record establishes that certain donations to political parties, called 'soft money,' were made to gain access to elected officials," "*[t]his case, however, is about independent expenditures, not soft money.*" *Id.,* at 360–361 (emphasis added).

The plurality's use of *Citizens United'*s narrow definition of corruption here, however, is a different matter. That use does not come accompanied with a limiting context (independent expenditures by corporations and unions) or limiting language. It applies to the whole of campaign finance regulation. And, as I have pointed out, it is flatly inconsistent with the broader definition of corruption upon which *McConnell'*s holding depends.

So: Does the Court intend today to overrule *McConnell*? Or does it intend to leave *McConnell* and BCRA in place? The plurality says the latter. *Ante,* at 20–21, n. 6 ("Our holding about the constitutionality of the aggregate limits clearly does not overrule *McConnell'*s holding about 'soft money'"). But how does the plurality explain its rejection of the broader definition of corruption, upon which *McConnell'*s holding depends? Compare *ante,* at 18–21, with *McConnell*, 540 U. S., at 146, 149–153.

## III

The plurality invalidates the aggregate contribution limits for a second reason. It believes they are no longer needed to prevent contributors from circumventing federal

limits on direct contributions to individuals, political parties, and political action committees. *Ante*, at 22–29. Cf. *Buckley*, 424 U. S., at 38 (aggregate limits "prevent evasion" of base contribution limits). Other "campaign finance laws," combined with "experience" and "common sense," foreclose the various circumvention scenarios that the Government hypothesizes. *Ante,* at 28. Accordingly, the plurality concludes, the aggregate limits provide no added benefit.

The plurality is wrong. Here, as in *Buckley*, in the absence of limits on aggregate political contributions, donors can and likely will find ways to channel millions of dollars to parties and to individual candidates, producing precisely the kind of "corruption" or "appearance of corruption" that previously led the Court to hold aggregate limits constitutional. Those opportunities for circumvention will also produce the type of corruption that concerns the plurality today. The methods for using today's opinion to evade the law's individual contribution limits are complex, but they are well known, or will become well known, to party fundraisers. I shall describe three.

A

*Example One: Gifts for the Benefit of the Party*. Campaign finance law permits each individual to give $64,800 over two years to a national party committee. 2 U. S. C. §441a(a)(1)(B); 78 Fed. Reg. 8532 (2013). The two major political parties each have three national committees. *Ante*, at 4, n. 1. Federal law also entitles an individual to give $20,000 to a state party committee over two years. §441a(a)(1)(D). Each major political party has 50 such committees. Those individual limits mean that, in the absence of any aggregate limit, an individual could legally give to the Republican Party or to the Democratic Party about $1.2 million over two years. See Appendix B, Table 1, *infra*, at 39. To make it easier for contributors to give

gifts of this size, each party could create a "Joint Party Committee," comprising all of its national and state party committees. The titular heads could be the Speaker of the House of Representatives and the Minority Leader of the House. A contributor could then write a single check to the Joint Party Committee—and its staff would divide the funds so that each constituent unit receives no more than it could obtain from the contributor directly ($64,800 for a national committee over two years, $20,000 for a state committee over the same). Before today's decision, the total size of Rich Donor's check to the Joint Party Committee was capped at $74,600—the aggregate limit for donations to political parties over a 2-year election cycle. See §441a(a)(3)(B); 78 Fed. Reg. 8532. After today's decision, Rich Donor can write a single check to the Joint Party Committee in an amount of about $1.2 million.

Will political parties seek these large checks? Why not? The recipient national and state committees can spend the money to buy generic party advertisements, say television commercials or bumper stickers saying "Support Republicans," "Support Democrats," or the like. They also can transfer the money to party committees in battleground States to increase the chances of winning hotly contested seats. See §441a(a)(4) (permitting national or state political committees to make unlimited "transfers" to other committees "of the same political party").

Will party officials and candidates solicit these large contributions from wealthy donors? Absolutely. Such contributions will help increase the party's power, as well as the candidate's standing among his colleagues.

Will elected officials be particularly grateful to the large donor, feeling obliged to provide him special access and influence, and perhaps even a *quid pro quo* legislative favor? That is what we have previously believed. See *McConnell*, 540 U. S., at 182 ("Large soft-money donations at a candidate's or officeholder's behest give rise to all of

the same corruption concerns posed by contributions made directly to the candidate or officeholder"); *id.*, at 308 (opinion of KENNEDY, J.) ("The making of a solicited gift is a *quid* both to the recipient of the money and to the one who solicits the payment"); *Colorado II*, 533 U. S., at 460, n. 23 (explaining how a candidate can "become a player [in his party] beyond his own race" by "directing donations to the party and making sure that the party knows who raised the money," and that "the donor's influence is multiplied" in such instances). And, as the statements collected in Appendix A, *infra*, make clear, we have believed this with good reason.

*Example Two: Donations to Individual Candidates (The $3.6 Million Check).* The first example significantly *understates* the problem. That is because federal election law also allows a single contributor to give $5,200 to each party candidate over a 2-year election cycle (assuming the candidate is running in both a primary and a general election). §441a(a)(1)(A); 78 Fed. Reg. 8532. There are 435 party candidates for House seats and 33 party candidates for Senate seats in any given election year. That makes an additional $2.4 million in allowable contributions. Thus, without an aggregate limit, the law will permit a wealthy individual to write a check, over a 2-year election cycle, for $3.6 million—all to benefit his political party and its candidates. See Appendix B, Table 2(a), *infra*, at 39.

To make it easier for a wealthy donor to make a contribution of this size, the parties can simply enlarge the composition of the Joint Party Committee described in *Example One*, so that it now includes party candidates. And a party can proliferate such joint entities, perhaps calling the first the "Smith Victory Committee," the second the "Jones Victory Committee," and the like. See 11 CFR §102.17(c)(5) (2012). (I say "perhaps" because too transparent a name might call into play certain earmarking

rules. But the Federal Election Commission's (FEC) database of joint fundraising committees in 2012 shows similarly named entities, *e.g.,* "Landrieu Wyden Victory Fund," etc.).

As I have just said, without any aggregate limit, the law will allow Rich Donor to write a single check to, say, the Smith Victory Committee, for up to $3.6 million. This check represents "the total amount that the contributor could contribute to all of the participants" in the Committee over a 2-year cycle. §102.17(c)(5). The Committee would operate under an agreement that provides a "formula for the allocation of fundraising proceeds" among its constituent units. §102.17(c)(1). And that "formula" would divide the proceeds so that no committee or candidate receives more than it could have received from Rich Donor directly—$64,800, $20,000, or $5,200. See §102.17(c)(6).

So what is wrong with that? The check is considerably larger than *Example One'*s check. But is there anything else wrong? The answer is yes, absolutely. The law will also permit a party and its candidates to shift most of Rich Donor's contributions to a *single* candidate, say Smith. Here is how:

The law permits each candidate and each party committee in the Smith Victory Committee to write Candidate Smith a check directly. For his primary and general elections combined, they can write checks of up to $4,000 (from each candidate's authorized campaign committee) and $10,000 (from each state and national committee). 2 U. S. C. §§432(e)(3)(B), 441a(a)(2)(A); 11 CFR §110.3(b). This yields a potential $1,872,000 (from candidates) plus $530,000 (from party committees). Thus, the law permits the candidates and party entities to redirect $2.37 million of Rich Donor's $3.6 million check to Candidate Smith. It also permits state and national committees to contribute to Smith's general election campaign through making

coordinated expenditures—in amounts that range from $46,600 to $2.68 million for a general election (depending upon the size of Smith's State and whether he is running for a House or Senate seat). 78 Fed. Reg. 8530–8532. See Appendix B, Table 2(b), *infra*, at 40.

The upshot is that Candidate Smith can receive at least $2.37 million and possibly the full $3.6 million contributed by Rich Donor to the Smith Victory Committee, even though the funds must first be divided up among the constituent units before they can be rerouted to Smith. Nothing requires the Smith Victory Committee to explain in advance to Rich Donor all of the various transfers that will take place, and nothing prevents the entities in the Committee from informing the donor and the receiving candidate after the fact what has transpired. Accordingly, the money can be donated and rerouted to Candidate Smith without the donor having violated the base limits or any other FEC regulation. And the evidence in the *McConnell* record reprinted in Appendix A, *infra*—with respect to soft money contributions—makes clear that Candidate Smith will almost certainly come to learn from whom he has received this money.

The parties can apply the same procedure to other large donations, channeling money from Rich Donor Two to Candidate Jones. If 10 or 20 candidates face particularly tight races, party committees and party candidates may work together to channel Rich Donor One's multimillion dollar contribution to the Most Embattled Candidate (*e.g.,* Candidate Smith), Rich Donor Two's multimillion dollar contribution to the Second Most Embattled Candidate (*e.g.,* Candidate Jones), and so on down the line. If this does not count as evasion of the base limits, what does? Present aggregate limits confine the size of any individual gift to $123,200. Today's opinion creates a loophole measured in the millions.

*Example Three: Proliferating Political Action Commit-*

*tees (PACs).* Campaign finance law prohibits an individual from contributing (1) more than $5,200 to any candidate in a federal election cycle, and (2) more than $5,000 to a PAC in a calendar year. 2 U. S. C. §§441a(a)(1)(A), (C); 78 Fed. Reg. 8532. It also prohibits (3) any PAC from contributing more than $10,000 to any candidate in an election cycle. §441(a)(2)(A). But the law does not prohibit an individual from contributing (within the current $123,200 biannual aggregate limit) $5,000 to each of an unlimited total number of PACs. And there, so to speak, lies the rub.

Here is how, without any aggregate limits, a party will be able to channel $2 million from each of ten Rich Donors to each of ten Embattled Candidates. Groups of party supporters—individuals, corporations, or trade unions—create 200 PACs. Each PAC claims it will use the funds it raises to support several candidates from the party, though it will favor those who are most endangered. (Each PAC qualifies for "multicandidate" status because it has received contributions from more than 50 persons and has made contributions to five federal candidates at some point previously. §441a(a)(4); 11 CFR §100.5(e)(3)). Over a 2-year election cycle, Rich Donor One gives $10,000 to each PAC ($5,000 per year)—yielding $2 million total. Rich Donor 2 does the same. So, too, do the other eight Rich Donors. This brings their total donations to $20 million, disbursed among the 200 PACs. Each PAC will have collected $100,000, and each can use its money to write ten checks of $10,000—to each of the ten most Embattled Candidates in the party (over two years). See Appendix B, Table 3, *infra*, at 41. Every Embattled Candidate, receiving a $10,000 check from 200 PACs, will have collected $2 million.

The upshot is that ten Rich Donors will have contributed $2 million each, and ten Embattled Candidates will have collected $2 million each. In this example, unlike *Example Two,* the recipient candidates may not know

which of the ten Rich Donors is personally responsible for the $2 million he or she receives. But the recipient candidate is highly likely to know who the ten Rich Donors are, and to feel appropriately grateful. Moreover, the ability of a small group of donors to contribute this kind of money to threatened candidates is not insignificant. In the example above—with ten Rich Donors giving $2 million each, and ten Embattled Candidates receiving $2 million each—the contributions would have been enough to finance a considerable portion of, and perhaps all of, the candidates' races in the 2012 elections. See Appendix C, Table 1, *infra*, at 42 (showing that in 2012, the average winning House candidate spent $1.6 million and the average winning Senate candidate spent $11.5 million).

## B

The plurality believes that the three scenarios I have just depicted either pose no threat, or cannot or will not take place. It does not believe the scenario depicted in *Example One* is any cause for concern, because it involves only "general, broad-based support of a political party." *Ante,* at 37. Not so. A candidate who solicits a multimillion dollar check for his party will be deeply grateful to the checkwriter, and surely could reward him with a *quid pro quo* favor. The plurality discounts the scenarios depicted in *Example Two* and *Example Three* because it finds such circumvention tactics "illegal under current campaign finance laws," "implausible," or "divorced from reality." *Ante,* at 23, 24, 28. But they are not.

The plurality's view depends in large part upon its claim that since this Court decided *Buckley* in 1976, changes in either statutory law or in applicable regulations have come to make it difficult, if not impossible, for these circumvention scenarios to arise. Hence, it concludes, there is no longer a need for aggregate contribution limits. See *ante,* at 11–13, 22–29. But a closer examination of the five

legal changes to which the plurality points makes clear
that those changes cannot effectively stop the abuses that
I have depicted.

First, the plurality points out that in 1976 (a few
months after this Court decided *Buckley*) Congress "added
limits on contributions *to* political committees," *i.e.,* to
PACs. *Ante,* at 11; accord, 90 Stat. 487 (codified at 2
U. S. C. §441a(a)(1)(C)). But *Example Three,* the here-
relevant example, takes account of those limits, namely,
$5,000 to a PAC in any given year. And it shows that the
per-PAC limit does not matter much when it comes to the
potential for circumvention, as long as party supporters
can create dozens or hundreds of PACs. Federal law
places no upper limit on the number of PACs supporting a
party or a group of party candidates that can be estab-
lished. And creating a PAC is primarily a matter of pa-
perwork, a knowledgeable staff person, and a little time.

Second, the plurality points out that in 1976, Congress
"also added an antiproliferation rule prohibiting donors
from creating or controlling multiple affiliated political
committees." *Ante,* at 12. The rule provides that "all
contributions made by political committees established or
financed or maintained or controlled" by the same corpora-
tion, labor organization, person, or group of persons, "shall
be considered to have been made by a single political
committee." §441a(a)(5). But different supporters can
create different PACs. Indeed, there were roughly 2,700
"nonconnected" PACs (*i.e.,* PACs not connected to a spe-
cific corporation or labor union) operating during the 2012
elections. *Ante,* at 24. In a future without aggregate
contribution limits, far more nonconnected PACs will
likely appear. The plurality also notes that the FEC can
examine certain "'circumstantial factors,'" such as "'com-
mon or overlapping membership'" or "'similar patterns of
contributions,'" to determine whether a group of PACs are
affiliated. *Ante,* at 25 (quoting 11 CFR §100.5(g)(4)(ii)).

But the ultimate question in the affiliation inquiry is whether "one committee or organization [has] been established, financed, maintain or controlled by another committee or sponsoring organization." *Ibid.* Just because a group of multicandidate PACs all support the same party and all decide to donate funds to a group of endangered candidates in that party does not mean they will qualify as "affiliated" under the relevant definition. This rule appears inadequate to stop the sort of circumvention depicted in *Example Three*.

Third, the plurality says that a post-*Buckley* regulation has strengthened the statute's earmarking provision. *Ante,* at 12. Namely, the plurality points to a rule promulgated by the FEC in 1976, specifying that earmarking includes any "designation 'whether direct or indirect, express or implied, oral or written.'" *Ibid.* (quoting 11 CFR §110.6(b)); accord, 41 Fed. Reg. 35950 (1976). This means that if Rich Donor were to give $5,000 to a PAC while "designat[ing]" (in any way) that the money go to Candidate Smith, those funds must count towards Rich Donor's total allowable contributions to Smith—$5,200 per election cycle. But the virtually identical earmarking provision in effect when this Court decided *Buckley* would have required the same thing. That provision also counted, when applying the base contribution limits, "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to a candidate." 88 Stat. 1264; accord, 2 U. S. C. §441a(a)(8) (same). What is the difference?

Fourth, the plurality points out that the FEC's regulations "specify that an individual who has contributed to a particular candidate committee may not also contribute to a *single*-candidate committee for that candidate." *Ante,* at 12–13 (citing 11 CFR §110.1(h)(1); emphasis added). The

regulations, however, do not prevent a person who has contributed to a candidate from also contributing to *multi*-candidate committees that support the candidate. Indeed, the rules specifically authorize such contributions. See §110.1(h) ("A person *may contribute* to a candidate . . . and *also contribute* to a political committee which has supported, or anticipates supporting, the same candidate in the same election," as long as the political committee is "not the candidate's principal campaign committee" or a "single candidate committee" (emphasis added)). *Example Three* illustrates the latter kind of contribution. And briefs before us make clear that the possibility for circumventing the base limits through making such contributions is a realistic, not an illusory, one. See Brief for Appellee 36 (demonstrating that many PACs today explain in their public materials just what fairly small group of candidates they intend to support); Brief for Americans for Campaign Reform as *Amicus Curiae* 14–15 (similar).

Fifth, the plurality points to another FEC regulation (also added in 1976), which says that "an individual who has contributed to a candidate" may not "also contribute to a political committee that has supported or anticipates supporting the same candidate if the individual knows that 'a substantial portion [of his contribution] will be contributed to, or expended on behalf of,' that candidate." *Ante,* at 13 (quoting 11 CFR §110.1(h)(2); brackets in original); accord, 41 Fed. Reg. 35948. This regulation is important, for in principle, the FEC might use it to prevent the circumstances that *Examples Two* and *Three* set forth from arising. And it is not surprising that the plurality relies upon the existence of this rule when it describes those circumstances as "implausible," "illegal," or "divorced from reality." *Ante,* at 23, 24, 28.

In fact, however, this regulation is not the strong anti-circumvention weapon that the plurality imagines. Despite the plurality's assurances, it does not "disarm" the

possibilities for circumvention.  *Ante,* at 23.  That is because the regulation requires a showing that donors have "*knowledge* that a substantial portion" of their contributions will be used by a PAC to support a candidate to whom they have already contributed.  §110.1(h)(2) (emphasis added).  And "knowledge" is hard to prove.

I have found nine FEC cases decided since the year 2000 that refer to this regulation.  In all but one, the FEC failed to find the requisite "knowledge"—despite the presence of *Example Two* or *Example Three* circumstances.  See Factual and Legal Analysis, *In re: Transfund PAC*, Matter Under Review (MUR) 6221, p. 11 (FEC, June 7, 2010) (although the donor "might reasonably infer that some portion of his contribution" to a candidate's Leadership PAC would be used to support the candidate, "such an inference alone does not suggest that [he] had 'actual knowledge'" of such); Factual and Legal Analysis, *In re: John Shadegg's Friends*, MUR 5968, pp. 3, 6–7 (FEC, Nov. 10, 2008) ("[T]here is no basis on which to conclude that [the donors] knew that the funds they contributed to LEAD PAC would be used to support the Shadegg Committee" even though Congressman Shadegg solicited the donations and LEAD PAC was Congressman Shadegg's Leadership PAC); Factual and Legal Analysis, *In re: Walberg for Congress*, MUR 5881, pp. 6, 9–11 (FEC, Aug. 15, 2007) (finding seven contributors, who gave to a candidate and to a PAC that provided 86% of the candidate's financing, had not shown "knowledge"); Factual and Legal Analysis, *In re: Matt Brown for Senate*, MUR 5732, p. 11 (FEC, Apr. 4, 2007) ("Though it may be reasonable to infer that the individual donors solicited by Brown gave to the State Parties under the assumption that some portion of their contribution might then be donated to the Brown Committee, such an inference alone is insufficient to find reason to believe 11 CFR §110.1(h) has been violated"); First General Counsel's Report, *In re: Liffrig for Senate*, MUR 5678,

pp. 8–9 (FEC, Nov. 27, 2006) (similar); First General Counsel's Report, *In re: Nesbitt*, MUR 5445, pp. 11–12 (FEC, Feb. 2, 2005) (similar); First General Counsel's Report, *In re: Keystone Corp.*, MUR 5019, pp. 23–29 (FEC, Feb. 5, 2001) (similar); General Counsel's Report #2, *In re: Boston Capital Corp.*, MUR 4538, pp. 17–18 (FEC, Mar. 10, 2000) (recommending the FEC take no action with respect to the §110.1(h) issue). Given this record of FEC (in)activity, my reaction to the plurality's reliance upon agency enforcement of this rule (as an adequate substitute for Congress' aggregate limits) is like Oscar Wilde's after reading Dickens' account of the death of Little Nell: "One must have a heart of stone," said Wilde, "to read [it] without laughing." Oxford Dictionary of Humorous Quotations 86 (N. Sherrin 2d ed. 2001).

I have found one contrary example—the single example to which the plurality refers. *Ante,* at 25 (citing Conciliation Agreement, *In re Riley*, MURs 4568, 4633, 4634, 4736 (FEC, Dec. 19, 2001)). In that case, the FEC found probable cause to believe that three individual contributors to several PACs had the requisite "knowledge" that the PACs would use a "substantial portion" of their contributions to support a candidate to whom they had already contributed— Sam Brownback, a candidate for the Senate (for two of the contributors), and Robert Riley, a candidate for the House (for the third). The individuals had made donations to several PACs operating as a network, under the direction of a single political consulting firm. The two contributors to Sam Brownback were his parents-in-law, and the FEC believed they might be using the PAC network to channel extra support to him. The contributor to Robert Riley was his son, and the FEC believed he might be doing the same. The facts in this case are unusual, for individual contributors are not typically relatives of the candidates they are seeking to support, and ordinary PACs do not tend to work in coordination under the direction of a con-

sulting firm. In any event, this single swallow cannot make the plurality's summer.

Thus, it is not surprising that throughout the many years this FEC regulation has been in effect, political parties and candidates have established ever more joint fundraising committees (numbering over 500 in the last federal elections); candidates have established ever more "Leadership PACs" (numbering over 450 in the last elections); and party supporters have established ever more multicandidate PACs (numbering over 3,000 in the last elections). See Appendix C, Tables 2–3, *infra*, at 42–43; FEC, 2014 Committee Summary (reporting the number of "qualified" (or multicandidate) PACs in 2012), online at http://www.fec.gov/data/CommitteeSummary.do (all Internet materials as visited Mar. 28, 2014, and available in Clerk of Court's case file).

Using these entities, candidates, parties, and party supporters can transfer and, we are told, have transferred large sums of money to specific candidates, thereby avoiding the base contribution limits in ways that *Examples Two* and *Three* help demonstrate. See Brief for Appellee 38–39, 53–54; Brief for Campaign Legal Center, et al. as *Amici Curiae* 12–15; Brief of Democratic Members of the United States House of Representatives as *Amici Curiae* 28–29. They have done so without drawing FEC prosecution—at least not according to my (and apparently the plurality's) search of publicly available records. That is likely because in the real world, the methods of achieving circumvention are more subtle and more complex than our stylized *Examples Two* and *Three* depict. And persons have used these entities to channel money to candidates without any individual breaching the current aggregate $123,200 limit. The plurality now removes that limit, thereby permitting wealthy donors to make aggregate contributions not of $123,200, but of several millions of dollars. If the FEC regulation has failed to plug a small

hole, how can it possibly plug a large one?

## IV

The plurality concludes that even if circumvention were a threat, the aggregate limits are "poorly tailored" to address it. *Ante,* at 30. The First Amendment requires "'a fit that is . . . reasonable,'" and there is no such "fit" here because there are several alternative ways Congress could prevent evasion of the base limits. *Ibid.* (quoting *Fox,* 492 U. S., at 480). For instance, the plurality posits, Congress (or the FEC) could "tighten . . . transfer rules"; it could require "contributions above the current aggregate limits to be deposited into segregated, nontransferable accounts and spent only by their recipients"; it could define "how many candidates a PAC must support in order to ensure that 'a substantial portion' of a donor's contribution is not rerouted to a certain candidate"; or it could prohibit "donors who have contributed the current maximum sums from further contributing to political committees that have indicated they will support candidates to whom the donor has already contributed." *Ante,* at 33–35 (quoting 11 CFR §110.1(h)(2)).

The plurality, however, does not show, or try to show, that these hypothetical alternatives could effectively replace aggregate contribution limits. Indeed, it does not even "opine on the validity of any particular proposal," *ante,* at 35—presumably because these proposals themselves could be subject to constitutional challenges. For the most part, the alternatives the plurality mentions were similarly available at the time of *Buckley.* Their hypothetical presence did not prevent the Court from upholding aggregate limits in 1976. How can their continued hypothetical presence lead the plurality now to conclude that aggregate limits are "poorly tailored?" See *ante,* at 30. How can their continued hypothetical presence lead the Court to overrule *Buckley* now?

In sum, the explanation of why aggregate limits are needed is complicated, as is the explanation of why other methods will not work. But the conclusion is simple: There is no "substantial mismatch" between Congress' legitimate objective and the "means selected to achieve it." *Ante,* at 10. The Court, as in *Buckley,* should hold that aggregate contribution limits are constitutional.

V

The District Court in this case, holding that *Buckley* foreclosed McCutcheon's constitutional challenge to the aggregate limits, granted the Government's motion to dismiss the complaint prior to a full evidentiary hearing. See 893 F. Supp. 2d 133, 140–141 (DC 2012). If the plurality now believes the District Court was wrong, then why does it not return the case for the further evidentiary development which has not yet taken place?

In the past, when evaluating the constitutionality of campaign finance restrictions, we have typically relied upon an evidentiary record amassed below to determine whether the law served a compelling governmental objective. And, typically, that record contained testimony from Members of Congress (or state legislators) explaining why Congress (or the legislature) acted as it did. See, *e.g., McConnell*, 540 U. S., at 147–154 (upholding federal restrictions on soft money by drawing on an extensive District Court record that contained declarations from current and former Members of Congress); *Colorado II*, 533 U. S., at 457–465 (upholding federal limits on coordinated expenditures between parties and candidates on the basis of a summary judgment record that contained declarations from party operatives, fundraisers, and Members of Congress); *Shrink Missouri*, 528 U. S., at 393 (upholding Missouri's contribution limits on the basis of the lower court record, which contained similar declarations). If we are to overturn an act of Congress here, we should do so on

the basis of a similar record.

For one thing, an evidentiary record can help us determine whether or the extent to which we should defer to Congress' own judgments, particularly those reflecting a balance of the countervailing First Amendment interests I have described. Determining whether anticorruption objectives justify a particular set of contribution limits requires answering empirically based questions, and applying significant discretion and judgment. To what extent will unrestricted giving lead to corruption or its appearance? What forms will any such corruption take? To what extent will a lack of regulation undermine public confidence in the democratic system? To what extent can regulation restore it?

These kinds of questions, while not easily answered, are questions that Congress is far better suited to resolve than are judges. Thus, while court review of contribution limits has been and should be "rigorous," *Buckley*, 424 U. S., at 29, we have also recognized that "deference to legislative choice is warranted." *Beaumont*, 539 U. S., at 155. And that deference has taken account of facts and circumstances set forth in an evidentiary record.

For another thing, a comparison of the plurality's opinion with this dissent reveals important differences of opinion on fact-related matters. We disagree, for example, on the possibilities for circumvention of the base limits in the absence of aggregate limits. We disagree about how effectively the plurality's "alternatives" could prevent evasion. An evidentiary proceeding would permit the parties to explore these matters, and it would permit the courts to reach a more accurate judgment. The plurality rationalizes its haste to forgo an evidentiary record by noting that "the parties have treated the question as a purely legal one." *Ante,* at 14, n. 4. But without a doubt, the legal question—whether the aggregate limits are closely drawn to further a compelling governmental inter-

est—turns on factual questions about whether corruption, in the absence of such limits, is a realistic threat to our democracy. The plurality itself spends pages citing figures about campaign spending to defend its "legal" conclusion. *Ante,* at 24–26, 27–28, 30–32. The problem with such reasoning is that this Court's expertise does not lie in marshaling facts in the primary instance. That is why in the past, when answering similar questions about the constitutionality of restrictions on campaign contributions, we have relied on an extensive evidentiary record produced below to inform our decision.

Without further development of the record, however, I fail to see how the plurality can now find grounds for overturning *Buckley.* The justification for aggregate contribution restrictions is strongly rooted in the need to assure political integrity and ultimately in the First Amendment itself. Part II, *supra.* The threat to that integrity posed by the risk of special access and influence remains real. Part III, *supra.* Even taking the plurality on its own terms and considering solely the threat of *quid pro quo* corruption (*i.e.,* money-for-votes exchanges), the aggregate limits are a necessary tool to stop circumvention. *Ibid.* And there is no basis for finding a lack of "fit" between the threat and the means used to combat it, namely the aggregate limits. Part IV, *supra.*

The plurality reaches the opposite conclusion. The result, as I said at the outset, is a decision that substitutes judges' understandings of how the political process works for the understanding of Congress; that fails to recognize the difference between influence resting upon public opinion and influence bought by money alone; that overturns key precedent; that creates huge loopholes in the law; and that undermines, perhaps devastates, what remains of campaign finance reform.

With respect, I dissent.

APPENDIXES

A

*Existence of Large Donations*

Expert Report: "During the 1996 election cycle, the top 50 nonfederal money donors made contributions ranging from $530,000 to $3,287,175. . . . Soft money financing of party campaigning exploded in the 2000 election cycle. Soft money spending by the national parties reached $498 million, now 42% of their total spending. Raising a half billion dollars in soft money [in 2000] took a major effort by the national parties and elected officials, but they had the advantage of focusing their efforts on large donors. . . . The top 50 soft money donors . . . each contributed between $955,695 and $5,949,000." 251 F. Supp. 2d, at 440 (opinion of Kollar-Kotelly, J.) (citing T. Mann Expert Report, pp. 22, 24–25)

*Candidate Solicitation of Large Donations*

Judicial Finding of Fact: "It is a common practice for Members of Congress to be involved in raising both federal and non-federal dollars for the national party committees, sometimes at the parties' request. The personal involvement of high-ranking Members of Congress is a major component of raising federal and nonfederal funds." 251 F. Supp. 2d, at 471.

Senator Paul Simon: "'While I was in Congress, the Democratic Congressional Campaign Committee (DCCC) and the Democratic Senatorial Campaign Committee (DSCC) would ask Members to make phone calls seeking contributions to the party. They would assign me a list of names, people I had not known previously, and I would just go

down the list. I am certain they did this because they found it more effective to have Members make calls.'" *Ibid.* (quoting Simon Decl. ¶7).

Senator John McCain: "'[T]he parties encourage Members of Congress to raise large amounts of soft money to benefit their own and others' re-election. At one recent caucus meeting, a Member of Congress was praised for raising $1.3 million dollars for the party. James Greenwood, a Republican Congressman from Pennsylvania, recently told the New York Times that House leaders consider soft money fundraising prowess in assigning chairmanships and other sought-after jobs. . . . I share Mr. Greenwood's concerns.'" *Id.*, at 476 (quoting McCain Decl. ¶7).

Representative Christopher Shays: "'Soft money is raised directly by federal candidates, officeholders, and national political party leaders. National party officials often raise these funds by promising donors access to elected officials. The national parties and national congressional campaign committees also request that Members of Congress make the calls to soft money donors to solicit more funds.'" *Id.*, at 471 (quoting Shays Decl. ¶18).

Representative Marty Meehan: "'Members of Congress raise money for the national party committees, and I have been involved in such fund-raising for the Democratic Party. At the request of the Party Members of Congress go to the [DCCC] and call prospective donors from lists provided by the Party to ask them to participate in Party events, such as DCCC dinners or Democratic National Committee (DNC) dinners. These lists typically consist of persons who have contributed to the Democratic Party in the past.'" 251 F. Supp. 2d, at 471 (quoting Meehan Decl. in *Republican National Committee* v. *FEC,* No. 98–CV–1207 (DC), ¶6).

Lobbyist: "'Even though soft money contributions often go to political parties, the money is given so that the contributors can be close to, and recognized by, Members, Presidents, and Administration officials who have power. Members, not party staffers or party chairs, raise much of the large soft money contributions.'" 251 F. Supp. 2d, at 472 (quoting Robert Rozen Decl. ¶15, a partner in a lobbying firm).

Senator Fred Thompson: "'We have gone from basically a small donor system . . . where the average person believed they had a stake, believed they had a voice, to one of extremely large amounts of money, where you are not a player unless you are in the $100,000 or $200,000 range [or more] . . . .'" *Id.*, at 433 (quoting 147 Cong. Rec. 4622 (2001)).

Former DNC official: "Former DNC and DSCC official and current lobbyist Robert Hickmott testifies that even incumbents with safe seats have incentives to raise money for the parties. He explains: 'Incumbents who were not raising money for themselves because they were not up for reelection would sometimes raise money for other Senators, or for challengers. They would send $20,000 to the DSCC and ask that it be entered on another candidate's tally. They might do this, for example, if they were planning to run for a leadership position and wanted to obtain support from the Senators they assisted. This would personally benefit them, in addition to doing their part to help retain Democratic control of the Senate, which would preserve the legislative power of all Democratic senators.'" 251 F. Supp. 2d, at 475–476 (quoting Hickmott Decl., Exh. A ¶18).

Judicial Finding of Fact: "The DSCC maintains a 'credit'

program that credits nonfederal money raised by a Senator or candidate to that Senator or candidate's state party. Amounts credited to a state party can reflect that the Senator or candidate solicited the donation, or can serve as a donor's sign of tacit support for the state party or the Senate candidate." 251 F. Supp. 2d, at 477 (citation omitted).

Judicial Finding of Fact: "Federal candidates also raise nonfederal money through joint fundraising committees formed with national committees. One common method of joint fundraising is for a national congressional committee to form a separate joint fundraising committee with a federal candidate committee. . . . Two experts characterize the joint fundraising system as one 'in which Senate candidates in effect raise[ ] soft money for use in their own races.'" *Id.*, at 478 (quoting J. Krasno and F. Sorauf Expert Report, p. 13; citation omitted).

*Donor Access and Influence*

Judicial Finding of Fact: "The fact that Members of Congress are intimately involved in the raising of money for the political parties, particularly unlimited nonfederal money donations, creates opportunities for corruption. The record does not contain any evidence of bribery or vote buying in exchange for donations of nonfederal money; however, the evidence presented in this case convincingly demonstrates that large contributions, particularly those nonfederal contributions surpassing the federal limits, provide donors access to federal lawmakers which is a critical ingredient for influencing legislation, and which the Supreme Court has determined constitutes corruption." 251 F. Supp. 2d, at 481.

Judicial Finding of Fact: "Individual donors testify that

contributions provide access to influence federal office-holders on issue of concern to them." *Id.*, at 498.

Political donor: "'I've been involved in political fundraising long enough to remember when soft money had little value to federal candidates. . . . [I]n recent election cycles, Members and national committees have asked soft money donors to write soft money checks to state and national parties solely in order to assist federal campaigns. Most soft money donors don't ask and don't care why the money is going to a particular state party, a party with which they may have no connection. What matters is that the donor has done what the Member asked.'" *Id.*, at 472 (quoting Wade Randlett, Chief Executive Officer, Dashboard Technology, Decl. ¶¶6–9).

Political donor: "'As a result of my $500,000 soft money donation to the DNC, I was offered the chance to attend events with the President, including events at the White House, a number of times. I was offered special access. . . .'" 251 F. Supp. 2d, at 499 (quoting Arnold Hiatt Decl. ¶9).

Senator Alan Simpson: "'Too often, Members' first thought is not what is right or wrong or what they believe, but how will it affect fundraising. Who, after all, can seriously contend that a $100,000 donation does not alter the way one thinks about—and quite possibly votes on—an issue? . . . When you don't pay the piper that finances your campaigns, you will never get any more money from that piper. Since money is the mother's milk of politics, you never want to be in that situation.'" 251 F. Supp. 2d, at 481 (quoting Simpson Decl. ¶10).

Senator Alan Simpson: "'Large donors of both hard and soft money receive special treatment. No matter how busy

a politician may be during the day, he or she will always make time to see donors who gave large amounts of money. Staffers who work for Members know who the big donors are, and those people always get their phone calls returned first and are allowed to see the Member when others are not.'"  251 F. Supp. 2d, at 481–482 (quoting Simpson Decl. ¶9).

Senator David Boren: "'Donations, including soft money donations to political parties, do affect how Congress operates. It's only natural, and happens all too often, that a busy Senator with 10 minutes to spare will spend those minutes returning the call of a large soft money donor rather than the call of any other constituent. . . . I know from my first-hand experience and from my interactions with other Senators that they did feel beholden to large donors." 251 F. Supp. 2d, at 482 (quoting Boren Decl. ¶¶7–8).

Senator Dale Bumpers: "[Senator Bumpers] had 'heard that some Members even keep lists of big donors in their offices,' and [stated] that 'you cannot be a good Democratic or good Republican Member and not be aware of who gave money to the party.'"  251 F. Supp. 2d, at 487 (quoting Bumpers Decl. ¶¶18, 20).

Representative Christopher Shays: "'The candidates know who makes these huge contributions and what these donors expect. Candidates not only solicit these funds themselves, they meet with big donors who have important issues pending before the government; and sometimes, the candidates' or the party's position appear to change after such meetings.'"  251 F. Supp. 2d, at 487 (quoting 148 Cong Rec. 1305 (2002)).

Senator Warren Rudman: "'Large soft money contri-

butions in fact distort the legislative process. They affect what gets done and how it gets done. They affect whom Senators and House members see, whom they spend their time with, what input they get . . . .'" 251 F. Supp. 2d, at 496 (quoting Rudman Decl. ¶¶7, 9).

Senator Paul Simon: "'While I realize some argue donors don't buy favors, they buy access. That access is the abuse and it affects all of us. . . . You feel a sense of gratitude for their support. . . . Because few people can afford to give over $20,000 or $25,000 to a party committee, those people who can will receive substantially better access to elected federal leaders than people who can only afford smaller contributions or can not afford to make any contributions. When you increase the amount that people are allowed to give, or let people give without limit to the parties, you increase the danger of unfair access.'" 251 F. Supp. 2d, at 496 (quoting Simon Decl. ¶16).

Senator John McCain: "'At a minimum, large soft money donations purchase an opportunity for the donors to make their case to elected officials . . . in a way average citizens cannot.'" 251 F. Supp. 2d, at 496 (quoting McCain Decl. ¶6).

Senator Warren Rudman: "'I understand that those who opposed passage of the Bipartisan Campaign Reform Act, and those who now challenge its constitutionality in Court, dare elected officials to point to specific [instances of vote buying]. I think this misses the point altogether. [The access and influence accorded large donors] is inherently, endemically, and hopelessly corrupting. You can't swim in the ocean without getting wet; you can't be part of this system without getting dirty.'" 251 F. Supp. 2d, at 481 (quoting Rudman Decl. ¶10).

Appendix A to opinion of BREYER, J.

Judicial Finding of Fact: "Lobbyists state that their clients make donations to political parties to achieve access." 251 F. Supp. 2d, at 489.

Letter from Republican National Committee (RNC) staffer: "'As you know, [this executive] has been very generous to the RNC. If there is any way you can assist [in obtaining an appointment with an important Senator], it would be greatly appreciated.'" *Id.*, at 501 (quoting Memorandum from Tim Barnes, RNC, to Royal Roth).

Letter from RNC: "[The] letter from RNC to Senator Hagel staffer [asks] Senator Hagel to meet with a donor for four 'key' reasons including: . . . '[h]e just contributed $100,000 to the RNC.'" *Ibid.* (quoting a letter in the judicial record).

Judicial Finding of Fact: "The political parties have structured their donation programs so that donors are encouraged to contribute larger amounts in order to get access to more exclusive and intimate events at which Members or Congress are present. The evidence also shows that the parties use the enticement of access to secure larger donations. " *Id.*, at 502 (quoting a document in the judicial record).

**B**

### Table 1: Donations to Support the Party

|  | Base Limit (per year) | Number (committees) | Years | Total Contributions (per 2-year cycle) |
|---|---|---|---|---|
| National Party Committees | $32,400 | 3 | 2 | $194,400 |
| State Party Committees | $10,000 | 50 | 2 | $1,000,000 |
| **Total** |  |  |  | **$1,194,400** |

Source: See 2 U. S. C. §§441a(a)(1)(B), (D); 78 Fed. Reg. 8532.

### Table 2(a): The $3.6 Million Check

|  | Base Limit (per year/ election) | Number (committees/ candidates) | Years or Elections | Total Contributions (per 2-year cycle) |
|---|---|---|---|---|
| National Party Committees | $32,400 | 3 | 2 | $194,400 |
| State Party Committees | $10,000 | 50 | 2 | $1,000,000 |
| Candidates (Senate) | $2,600 | 33 | 2 | $171,600 |
| Candidates (House) | $2,600 | 435 | 2 | $2,262,000 |
| **Total** |  |  |  | **$3,628,000** |

Source: See 2 U. S. C. §§441a(a)(1)(A), (B), (D); 78 Fed. Reg. 8532.

Appendix B to opinion of BREYER, J.

## Table 2(b): Circumvention of the $3.6 Million Check

| | Direct Contributions to Candidate (per election) | Number (committees/ candidates) | Elections | Total Direct Contributions (per 2-year cycle) |
|---|---|---|---|---|
| National Party Committees | $5,000 | 3 | 2 | $30,000[1] |
| State Party Committees | $5,000 | 50 | 2 | $500,000 |
| Candidates (Senate) | $2,000 | 33 | 2 | $132,000 |
| Candidates (House) | $2,000 | 435 | 2 | $1,740,000 |
| **Total Direct Contributions** | | | | **$2,372,000** |
| | **Independent Expenditures (IEs) (per general election)** | | Elections | Total IEs (per general election) |
| | House Candidate | Senate Candidate | | |
| National Party Committees | $46,600 (min)[2] | $94,100 (min)[3] | 1 | $46,600– $93,100 (min) |
| State Party Committees | $46,600 (min)[2] | $94,100 (min)[3] | 1 | $46,600– $93,100 (min) |
| **Total IEs** | **$46,600 (min)[2]** | **$94,100 (min)[3]** | | **$46,600– $93,100 (min)** |

[1] $45,400 for a Senate candidate. §441a(h); 78 Fed. Reg. 8532.

[2] If the State has more than one House seat, this figure is $46,600. If it has one House seat, this figure is $93,100. *Id.*, at 8531.

[3] This figure ranges from $93,100 (Del.) to $2,68 million (Cal.), depending on the State's population. *Ibid.*

Source: See 2 U. S. C. §§432(e)(3)(B), 441a(a)(2)(A); 11 CFR §110.3(b); 78 Fed. Reg. 8530–8532.

Appendix B to opinion of BREYER, J.

## Table 3: Proliferating PACs

| | Base Limit (per year) | Number (PACs) | Years | Total Contributions (per 2-year cycle) |
|---|---|---|---|---|
| Rich Donor One | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Two | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Three | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Four | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Five | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Six | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Seven | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Eight | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Nine | $5,000 | 200 | 2 | $2,000,000 |
| Rich Donor Ten | $5,000 | 200 | 2 | $2,000,000 |
| **Total Contributions to PACs (by 10 Donors)** | | | | **$20,000,000** |
| **Total Contributions by Each Donor** | | | | **$2,000,000** |
| | Base Limit (per election) | Number (candidates) | Elections | |
| PAC One | $5,000 | 10 | 2 | $100,000 |
| PAC Two | $5,000 | 10 | 2 | $100,000 |
| PAC Three | $5,000 | 10 | 2 | $100,000 |
| . . . | etc. | etc. | etc. | etc. |
| PAC 200 | $5,000 | 10 | 2 | $100,000 |
| **Total Contributions by PACs (to 10 Candidates)** | | | | **$20,000,000** |
| **Total Contributions to Each Candidate** | | | | **$2,000,000** |

Source: 2 U. S. C. §§441a(a)(1)(C), 441a(a)(2)(A).

Appendix C to opinion of BREYER, J.

## C

## Table 1: Costs of a Federal Seat

|  | **2012 Elections** |
|---|---|
| House |  |
| Average House Winner Spent | $1,567,293 |
| Average House Loser Spent | $496,637 |
| Average Winner's Receipts from PACs | $665,728 |
| Senate |  |
| Average Senate Winner Spent | $11,474,077 |
| Average Senate Loser Spent | $7,435,446 |
| Average Winner's Receipts from PACs | $2,185,650 |

Source: Center for Responsive Politics, Election Stats, online at http://www.opensecrets.org/bigpicture/elec_stats.php.

## Table 2: Leadership PACs

|  | **Number of Leadership PACs (contributing to federal candidates)** | **Total Contributed (to federal candidates)** |
|---|---|---|
| 2000 Elections | 175 | $17,000,000 |
| 2002 Elections | 228 | $25,000,000 |
| 2004 Elections | 274 | $30,700,000 |
| 2006 Elections | 336 | $44,700,000 |
| 2008 Elections | 378 | $40,600,000 |
| 2010 Elections | 396 | $44,000,000 |
| 2012 Elections | 456 | $46,400,000 |

Source: Center for Responsive Politics, Leadership PACs, online at http://www.opensecrets.org/pacs.

Appendix C to opinion of BREYER, J.

## Table 3: Joint Fundraising Committees

|  | Number of Joint Fundraising Committees | "Senate" Related | "House" Related |
|---|---|---|---|
| 2008 Elections | 269 | 31 | 34 |
| 2010 Elections | 367 | 37 | 60 |
| 2012 Elections | 508 | 67 | 89 |

Source: Federal Election Commission, online at http://www.fec.gov/data/CommitteeSummary.do.